## Richmond

WILLIAM SINCLAIR CLARK v. KAY EUNICE GENERT CLARK.

December 6, 1968.

Record No. 6759.

Present, All the Justices.

*S. Page Higginbotham (N. Brent Higginbotham; Higginbotham & Fry, on brief), for appellant.*

*Christian C. Westerman (Quinlan H. Hancock, on brief), for appellee.*

SNEAD, J., delivered the opinion of the court.

On June 30, 1965, William Sinclair Clark, hereinafter referred to as complainant, filed a bill of complaint praying that he be granted a divorce *a vinculo matrimonii* from Kay Eunice Clark, hereinafter referred to as defendant, on the grounds of desertion and adultery, and that he be awarded custody of the infant son, Kevin, born of the mar-

riage. The defendant filed an answer and cross-bill in which she neither affirmed nor denied the charge of adultery, but alleged that her husband had constructively deserted her for a period of more than one year and asked for a divorce on that ground. She also alleged that two children were born of the marriage, Kevin and Jason, and prayed that she be awarded their custody, and that complainant be required to pay alimony as well as support and maintenance for the two children. The matter was referred to a commissioner in chancery to take evidence and file a report. Before the commissioner heard evidence, defendant was permitted to file an amended cross-bill in which she asked for a final decree of divorce on the ground that the parties had lived separate and apart for more than two years.

The commissioner filed his report on December 6, 1966. In it he found, among other things, that defendant wilfully deserted complainant on June 13, 1964; that she had committed acts of adultery, and that complainant was not the father of Jason. He recommended that complainant be granted a divorce *a vinculo matrimonii* and that custody of Kevin remain with defendant. The complainant excepted to that part of the report relating to the custody of Kevin. Thereafter, the chancellor heard additional evidence *ore tenus*. By a decree entered January 31, 1967, the exceptions to the commissioner's report were overruled, the report and findings of the commissioner were confirmed, complainant was awarded a divorce *a vinculo matrimonii* on the ground of adultery, and custody of Kevin was awarded to defendant. We granted complainant an appeal.

The sole issue presented in this appeal is whether the chancellor erred in awarding custody of Kevin to defendant, the mother, instead of to complainant, the father.

The evidence is not in material conflict and may be summarized as follows: On April 20, 1963 William Clark, age 25, and Kay Eunice Genert, age 22, were married at Fort McClellan, Alabama. Both were members of the Armed Forces and stationed at Fort McClellan. On October 11, 1963 Kevin was born. In January, 1964 complainant, after receiving his discharge from the Navy, moved with his wife and child to Atlanta and enrolled in Georgia Institute of Technology to study for a masters degree in engineering. The defendant secured employment and the complainant said that he "worked as a research assistant" at the Institute. Baby-sitters were employed to care for the child during the day.

Several months prior to June, 1964 it became apparent to defendant that marital difficulties were developing. Later she decided to leave

her husband and take Kevin with her. She advised complainant's parents, Mr. and Mrs. John D. Clark, Sr., of her plans and requested that they permit her and the child to live with them in their home in Fairfax, Virginia. Complainant's parents were agreeable to the suggestion, so they drove to Atlanta and brought defendant and Kevin back to Fairfax about the middle of June, 1964. Soon after her arrival defendant asked her mother-in-law whether there was any objection to her having dates. Mrs. Clark, Sr. advised against the proposal because defendant was a married person.

Shortly thereafter, defendant commenced going to parties with Eleanor Clark, her sister-in-law who was unmarried and lived in the same household. At one of these parties in July or August defendant became acquainted with a man named England. Later, on three different occasions, she accompanied England to his apartment after similar parties, got in his bed, and there had sexual relations with him. On another occasion they had sexual relations in a parked automobile. As a result of one of these illicit relations defendant became pregnant.

In February of 1965, defendant took Kevin to New York ostensibily to visit her home there. While in New York she gave birth to a boy, who was named Jason, on June 7. The defendant admitted in her testimony that this child's father could be no one other than England. Mr. and Mrs. Clark, Sr. learned that defendant had given birth to Jason and contemplated returning to the Fairfax area with the children. Primarily out of concern for Kevin, Mrs. Clark, Sr. telephoned defendant in New York and told her that she could return to the Clark home and remain there until she found an apartment. The defendant and her two children returned to Fairfax and lived with Mr. and Mrs. Clark, Sr. for approximately four weeks and then moved into an apartment which defendant rented in the vicinity of Fairfax.

In December, 1964 complainant completed his course at Georgia Institute of Technology and received a masters degree in engineering. Immediately thereafter he returned to his parent's home in Fairfax and saw his son for the first time since he (Kevin) left Atlanta in June, 1964. The complainant testified that because of his class schedule, the distance involved, and the lack of funds he had been unable to see his son before this time. About two days after complainant's arrival defendant took Kevin to New York to spend the Christmas holidays with her relatives. After staying with his parents during the Christmas season, complainant secured employment with Hittman

Associates in Baltimore and established his residence just outside of the city. In January, 1965 he began sending support money to his wife. After he learned of defendant's pregnancy he sent money for the support of Kevin only. The complainant has made frequent trips to Fairfax to see his son since he was brought back from New York in June, 1965.

The record shows that complainant is a fit and proper person for custody; that each parent loves Kevin and that he is happy with each of them. The same situation exists between the child and his grandparents who are well respected in the community. At the time of the hearing defendant was employed by the Institute For Defense Analysis at a net annual salary of $4,800 and worked between 8:30 a.m. and 5 p.m. Kevin and Jason were cared for during her working hours by a baby-sitter, who is a neighbor and friend of Mr. and Mrs. Clark, Sr.

The defendant has a high school education, and both of her parents are deceased. She has no income other than what she earns. Mr. and Mrs. Clark, Sr., who are college graduates, stated that defendant had done a "good job" caring for Kevin, and that if custody were granted complainant they would be willing to help look after Kevin.

The complainant, who was earning $10,800 annually, testified that he had decided to change jobs and locate in the Fairfax area in order to be closer to Kevin, and that if custody of the child were awarded him, he planned to temporarily leave him with Mr. and Mrs. Clark, Sr., and continue the same baby-sitter in order not to "change his setting drastically" until he could make arrangements to care for Kevin himself. He further stated that he would be willing to make whatever arrangements the court might suggest.

In awarding custody of Kevin to the mother, the chancellor observed, among other things, that except for the acts of adultery resulting in the birth of the illegitimate child, the evidence shows defendant is a fit mother, and that the dominant issue "is whether the presence of his [Kevin's] half-brother in the house is sufficient to compel a finding that it is not in his [Kevin's] best interest to remain with his mother". The chancellor concluded that under the circumstances existing the best interests of Kevin require that he remain with the mother, but if it later develops as the children become older that Jason's presence in defendant's home creates a situation that is detrimental to Kevin's best interest the custody question can be reconsidered by the court.

We have not heretofore had occasion to decide the question of custody as between husband and wife under facts similar to those in the present case. However, the fundamental principles to be used as guide lines in custody cases are enunciated in *Mullen* v. *Mullen*, 188 Va. 259, 49 S.E.2d 349. There we said, among other things:

"In Virginia, we have established the rule that the welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate.

\* \* \* \* \* \* \* \*

"The rule is to be administered with as much consideration for the tender ties of affection of the parents as possible under the circumstances, and especially when each parent is shown to be a fit and proper custodian of the child.

\* \* \* \* \* \* \* \*

"The rights of neither parent take precedence over the rights of the child. The welfare of the child is superior to the wishes and personal desires of either of them. In considering their qualifications and fitness, we must look to their adaptability to the task of caring for the child; their adaptability to control and direct it; the age, sex, and health of the child; its temporal and moral wellbeing, as well as the environment and circumstances of its proposed home; and the influences likely to be exerted upon the child.

"It is now generally recognized that the mother is the natural custodian of her child of tender years, and that if she is a fit and proper person, other things being equal, she should be given the custody in order that the child may receive the attention, care, supervision, and kindly advice, which arise from a mother's love and devotion, for which no substitute has ever been found. Human experience supports the policy that young children should not be deprived of the care of their mothers and of their love and tenderness, which may be counted upon most unfailingly. Experience also teaches that children grow up more normally when reared by young people rather than older people." 188 Va. pp. 269, 270, 271, 49 S.E.2d p. 354.

In custody cases, difficulty often arises in applying the facts in a particular case to the above quoted principles. Counsel for complainant contends, in substance, that the chancellor erred in awarding the custody of Kevin to defendant instead of to complainant because the evidence conclusively shows that defendant is not a fit person to have

custody, and because it is not in the child's best interest to be raised in the same household with his illegitimate half-brother.

· On the other hand counsel for defendant points out that the law favors awarding custody of a child of tender years to the mother, if she is a proper person and all things are equal, and that under certain circumstances the rule is applicable when the mother is the guilty party in a divorce suit. He argues that there was no evidence that defendant was not a good mother and did not do a good job caring for Kevin, and that "indiscrete [sic] acts in the past will not, necessarily, bar a mother from an award of custody." Counsel places emphasis on the fact that the chancellor heard evidence *ore tenus* and his findings are presumed to be correct, and that the burden is upon complainant to show that the chancellor either failed to follow correct principles of law or his findings are not supported by the evidence. This, he says, complainant has not done.

■ We recognize the rule that the chancellor's findings upon conflicting evidence heard *ore tenus* should be accorded great weight and ought not be disturbed unless plainly wrong or without supporting evidence. However, the conclusion reached in the case at bar was not based upon conflicting evidence. It involves a matter of opinion formed from evidence that is not in material conflict. See *Moyer* v. *Moyer*, 206 Va. 899, 904, 147 S.E.2d 148.

■ As has been stated, the defendant committed four separate acts of adultery over a period of several weeks at a time when her husband was pursuing his studies in Georgia and she and Kevin were living with Mr. and Mrs. Clark, Sr. in Fairfax. Such conduct cannot but be a reflection of the moral character of the defendant. In addition, one of these acts produced an illegitimate child who was not placed out for adoption and resides with his mother. If custody of Kevin, who was age 4 at the time of the award and now age 5, is permitted to remain with the mother under these circumstances the best interest of Kevin will not be served. We think the change in custody should be made now rather than waiting until Kevin is older and is confronted with and understands the status of Jason.

The record shows that complainant, the father, is a person of good moral character, is highly educated and devoted to the child. His parents, Mr. and Mrs. Clark, Sr., who have agreed to assist temporarily in caring for Kevin in their home, are also well educated and persons of good moral character. The wholesome environment and

the influences likely to be exerted upon the child in custody of complainant will operate to Kevin's best interest. We hold that the evidence does not support the chancellor's finding that the best interests of Kevin require that custody remain with the mother.

The case is remanded to the court below with direction to enter a decree in conformity with this opinion and to provide reasonable and appropriate visitation rights to the mother and the child. Such decree shall then be subject to the provisions of Code, § 20-108.

*Reversed and remanded.*

EGGLESTON, C.J., dissenting

This appeal involves the difficult problem of the custody of Kevin Clark, three years and three months old, the son of a couple divorced because of the adultery of the wife. At the time of the hearing and the entry of the final decree on January 31, 1967, the child was living with his mother, the divorced wife. In her household she was also caring for an illegitimate son, Jason, born to her on June 7, 1965 and then less than two years old.

The husband based his claim to the custody of Kevin, his son, on the adultery of the wife and the fact that if custody were allowed to remain with her he must live in his mother's household in the shadow of his illegitimate half brother, Jason.

The evidence shows that the divorced husband and wife are gainfully employed and either will be financially able to care for their son, Kevin. The undisputed evidence is that the divorced wife maintains a neat, clean and comfortable home where both children are properly taken care of and are happy. Indeed, the husband's father and mother so testified. It also appears that with commendable sympathy and compassion the husband's parents took this wayward mother and her illegitimate child into their home and allowed them to remain there until the mother could find living quarters for her little family.

After hearing and seeing the witnesses, the trial court announced that the best interests of Kevin required that he "remain with his mother" and awarded custody to her.

The majority opinion overturns that finding, with the statement that "the evidence does not support the chancellor's finding that the best interests of Kevin require that custody remain with the mother."

No evidence is cited to refute the opposite conclusion of the trial court.

I agree that the adultery of this young mother of itself should not deprive her of the custody of her child, Kevin. Certainly the husband, who admitted that he was the father of their son conceived before their marriage, is in no position to "cast a stone at her." Moreover, we are not here concerned with the punishment of the wayward wife. Our sole concern is the consideration of the best interests of Kevin.

I do not agree with the clear implication that the fact that Kevin must live with his illegitimate half brother, Jason, requires that this home be broken up and this little three-year-old boy, Kevin, be deprived of the love and care of his mother. Nor am I willing to join in a decree which will brand Jason, the illegitimate child, as an untouchable outcast whose mere presence in his mother's household makes it an unfit place for her to rear her legitimate child. There is no evidence whatsoever to support this view.

The implication that the presence of an illegitimate child in a household makes it an unfit place in which to rear legitimate children may have far-reaching consequences. Are such households to be broken up because unfit? What of many orphanages which habitually care for legitimate and illegitimate children together?

Moreover, it appears that the husband's parents are employed, and that if the custody of Kevin is awarded the husband, these grandparents with the assistance of a babysitter will be expected to look after the child. Thus there will be no change from the existing arrangement other than at nighttime and on weekends he will be in the home of his grandparents instead of the home of his mother. In this situation, the child will be deprived of the love and attention of his mother and the mother, whose devotion to him is attested by all of the witnesses, will be deprived of her infant son. Both mother and child will be punished, which surely is not the desired end of a custody decree.

The only alternative the husband suggests is the possibility of his remarriage, which he says is not imminent, and the possibility that his second wife might want the child. He also suggests that if he does not remarry and "as Kevin gets old enough to be able to take care of himself," he will bring the child to live with him. This seems to me a very uncertain and unsatisfactory prospect for an infant. Certainly it is not a proper substitute for the natural mother in whose care he has been since birth.

The present arrangement regarding the custody of this child has been a satisfactory one. No bitterness or animosity of the parties toward each other is shown by the record. The mother and grandparents visit each other frequently in their respective homes. The father and grandparents now enjoy full and free visitation rights with Kevin. This arrangement will undoubtedly be continued. The matter of custody will remain in the breast of the trial court. If at some future time, and as a result of a change in circumstances or in the marital status of either or both parties, a different arrangement is indicated for Kevin, the court in its discretion is free to act.

I would affirm the decree appealed from.

HARRISON, J., joins in this dissent.