CHARLES A. BUCKLAND

V.

COMMONWEALTH OF VIRGINIA, EX REL., ETC.

Record No. 831086

Decided April 26, 1985, at Richmond

Present: All the Justices

Randall A. Eads; Joseph P. Johnson, Jr. (Johnson, Scyphers & Austin,, on brief), for appellant.

Charles E. Schelin (Browning, Morefield, Schelin, and Arrington, P.C., on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

On March 5, 1981, Kimberly Ann Castle filed a petition in the juvenile and domestic relations district court against Charles A. Buckland alleging that he was the father of her daughter, born out of wedlock on February 16, 1981. She sought support for this child. The court, on the mother's petition, ordered that blood grouping tests be performed on the mother, child, and putative father. Admitting in evidence the results of the tests, which showed a 99.72% probability that Buckland was the child's father, the court found that Buckland was the father and ordered him to pay child support in specified amounts. Buckland's appeal to the circuit court was tried before a jury in September of 1982. The jury found Buckland to be the child's father and the court ordered him to pay support money and attorney's fees.

On appeal, Buckland contends that the trial court erred in denying his motion to exclude the results of the blood grouping tests and in denying his motion in limine and permitting witnesses to testify to his alleged admissions of paternity. He also challenges the court's exclusion of evidence of Castle's sexual activities after July of 1980.

At the time of trial in the circuit court, Code § 20-61.1, as amended in 1982 (Acts 1982, c. 307), provided as follows:

§ **20-61.1. Support of children of unwed parents by father; evidence of paternity.** — Whenever in proceedings hereafter under this chapter concerning a child whose parents are not married, a man admits before any court having jurisdiction to try and dispose of the same, that he is the father of the child or the court finds that the man has voluntarily admitted paternity in writing, under oath, or if it be shown by other

evidence beyond reasonable doubt that he is the father of the child and that he should be responsible for the support of the child, the court may then enter and enforce judgment for the support, maintenance and education of such child as if the child were born in lawful wedlock.

Such other evidence that the man is the father of the child shall be limited to evidence of the following:

(1) That he cohabited openly with the mother during all of the ten months immediately prior to the time the child was born; or

(2) That he gave consent to a physician or other person, not including the mother, charged with the responsibility of securing information for the preparation of a birth record that his name be used as the father of the child upon the birth records of the child; or

(3) That he allowed by a general course of conduct the common use of his surname by the child; or

(4) That he claimed the child as his child on any statement, tax return or other document filed and signed by him with any local, state or federal government or any agency thereof; or

(5) Results of medically reliable genetic blood grouping tests, which tests may include the human leukocyte antigen (HLA) test.[1]

. . . .

In 1981, Code § 20-61.2 authorized a court, when a question of paternity arose, to order a blood grouping test on motion of either party. Prior to its amendment in 1982, however, § 20-61.1, the controlling statute, did not permit the results of HLA tests to be introduced in evidence to prove paternity. We held that in its pre-amendment form the statute was unconstitutional because it discriminated against illegitimate children in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Jones* v. *Robinson*, 229 Va. 276, 329 S.E.2d 795 (1985), and *Hankerson* v.

---

[1] HLA testing involves an analysis of genetically-transmitted antigens on the white blood cells of the child, mother, and putative father. The test may either exclude the man as the child's father or achieve a statistical calculation of the probability of his paternity if he cannot be excluded. *See Jones* v. *Robinson*, 229 Va. 276, 280-81, 329 S.E.2d 795, 797-78 (1985), and *Hankerson* v. *Moody*, 229 Va. 270, 329 S.E.2d 791 (1985).

*Moody*, 229 Va. 270, 329 S.E.2d 791 (1985) (both this day decided).

Buckland has not challenged the constitutionality of § 20-61.1 or the admissibility of human leukocyte antigen (HLA) tests. Rather, he argues that the tests should have been excluded in this case because of irregularities in the testing procedures.

The case was tried as a civil case.[2] The trial court, stating that the case was civil, rejected a proffered instruction based on the presumption of innocence in a criminal prosecution and instructed the jury that to require Buckland to support the child it must find from the evidence beyond a reasonable doubt that he is the child's father by one of the methods specified in § 20-61.1.

At the jury trial in the circuit court, results of blood tests were introduced through the depositions of eight witnesses and related exhibits. The evidence revealed that blood samples of Castle, Buckland, and the child were drawn at a laboratory in Bristol, Tennessee. Patricia Osborne and Pam Lowry were the medical technologist and laboratory assistant who drew the blood and performed the tests. They identified the subjects, checking the driver's licenses of the adults and fingerprinting and photographing all three. While the normal procedure included identification of the child by a birth certificate, a copy of the child's birth certificate could not be found in the file at the time of the depositions. Neither Osborne nor Lowry could conclusively affirm or deny that a birth certificate was presented for the child. At the time of the testing, Castle identified the child in Buckland's presence without objection.

Osborne and Lowry independently conducted red cell antigen tests on the samples and their tests were interpreted by Dr. A. S. Crawford, a pathologist employed by the laboratory. Crawford determined that Buckland could not be excluded as the father on the basis of the red cell testing. Because Buckland could not be excluded, the samples were sent to Diaclin Laboratory in Nashville for further testing.

---

[2] The petition was tried in the juvenile and domestic relations district court with a criminal charge against Buckland of contributing to the delinquency of a minor. When that court ruled that Buckland was the child's father, it dismissed the criminal charge against him. It appears that some confusion in procedural nomenclature may have resulted from the style of the cases as they were heard in the juvenile and domestic relations district court.

Five employees of the Diaclin Laboratory described the acts they performed. Howard Bragdon obtained the samples in the mail and delivered them to the technologists. Barbara Pilkington duplicated the red cell tests done in the Bristol laboratory. Keith Schultz received the rest of the samples and gave them to Thomas Clark, who performed the HLA tests. Gary D. Niblack, a doctor of philosophy in microbiology, was director of the Histocompatibility Laboratory of Diaclin and transplant immunologist at the Veterans Administration Medical Center in Nashville. He evaluated the tests and determined that Buckland could not be excluded as the father.

Dr. Niblack testified that he had been employed in HLA testing since 1975, that he had been involved in approximately 15,000 tests, and that his laboratory was the official testing laboratory for Tennessee for paternity cases and also did testing for Florida in such cases. He testified to a 99.72% probability that Buckland was the child's father. He further explained that three of 1,000 random men could possess the necessary genetic makeup to produce the obligatory genes found in the child. He qualified the results by stating that they must be considered together with other information, such as access and time of conception.

Osborne, who drew the samples at the Bristol laboratory, testified that she took four tubes of blood from the child and six from each adult. Two tubes from each were used in the red cell tests done locally, and four tubes of each adult's blood and two of the child's blood were sent to Nashville for further testing. Normally, two yellow-stoppered tubes are sent for each adult and two green-stoppered tubes are sent for the child, all to be used in the white cell testing. Additional tubes, with red and purple tops, are usually sent to be used in red cell testing. Osborne did not specify that she sent red- or purple-stoppered tubes for the child.

Howard Bragdon testified that the Nashville laboratory received twelve tubes, two yellow, one red, and one purple for each adult and two green, one red, and one purple for the child. He delivered the tubes with red and purple tops to Pilkington and those with yellow and green tops to Schultz. Only the yellow- and green-stoppered tubes were ultimately involved in the HLA testing. All the laboratory employees handling the samples, in Bristol and in Nashville, testified that there was nothing unusual or out of the ordinary concerning the sampling, mailing, and testing procedures used.

In addition to the evidence as to the results of the blood tests, the jury heard Castle's testimony regarding her relationship with Buckland. She said she first had sexual intercourse with Buckland on May 6, 1980. Their relationship continued into September of 1980, and during this period they had intercourse approximately every two weeks. Castle said she had intercourse with no other men between April 1 and July 31, 1980. The court limited the evidence of sexual relationship with others to the period preceding July 31.[3] She learned she was pregnant in June, and her 6-pound, 11-ounce daughter was born February 16, 1981.

Over Buckland's objection, Castle testified to certain admissions Buckland allegedly made concerning paternity. He gave her $250 and $400 for an abortion, which she never had. Also over objection, her father and stepmother testified that Buckland admitted his paternity to them in discussions about the pregnancy and payment of expenses.

Buckland, testifying in his own behalf, admitted that he had sexual relations with Castle, beginning not May 6 as she stated but two weeks later on May 20. He also said she informed him she was pregnant late in June. He said he had admitted to her father that he "had gone to bed with his daughter." He had given her financial help because he "wanted to do the right thing" since he "had been with her." Buckland testified that he had requested the blood grouping tests ordered by the juvenile and domestic relations district court because he did not feel that he was the child's father.

Buckland and his wife both testified that Castle had admitted having sexual intercourse with others between May 1 and July 31, 1980. Castle denied any such admission.

---

[3] The court initially fixed the period from April 1 through July 1, counting back 10 months from the February 16 birth date to reach April 16. Buckland sought to introduce evidence of Castle's sexual relations with another man in September. Noting the child's birth weight of 6 pounds, 11 ounces, the court excluded the evidence because conception in September would have precluded the birth of a "fully mature baby" five months later. The court also relied on the evidence that Castle was pregnant in June and held that evidence of later sexual activity would be immaterial. The court allowed the parties to question the witnesses regarding Castle's activities with others during the period "May through July," not allowing them to "go beyond July of 1980." The court did not specify July 31, but the parties questioned the witnesses, without further objection, about activities between May 1 and July 31. Buckland's challenge to this ruling addresses only the later limit of this period, as he contends the birth could have been premature. He does not contend the court erred in fixing May 1 as the other limit on evidence of Castle's sexual activities.

██ Section 20-61.1 allows admission of the blood tests performed in this case. The evidence establishes that there was no break in the chain of custody of the blood samples tested, that proper testing procedures were followed, and that the results were reported by a qualified expert. We hold, therefore, that the trial court did not err in admitting the test results.

██ While a literal reading of § 20-61.1(5) would restrict the admissible evidence to the results of the blood tests, we believe such a construction is unreasonable and could not have been intended by the General Assembly. In addition to test results which establish a probability of paternity, the trier of fact should be allowed to hear evidence of the putative father's access to the mother during the probable period of conception. Otherwise, test results might form the basis of a finding of paternity without a foundation disclosing the nature and extent of the relationship between the parties. Such evidence was admitted without objection at trial.

██ We hold that the trial court properly limited the evidence of Castle's sexual activity to a reasonable period of conception based on the child's birth date and weight. Conception between May 1 and July 31, the period fixed by the court, would have resulted in a gestation period of between 200 and 291 days. The normal human gestation period is 266 days. *See Roe* v. *Wade*, 410 U.S. 113, 125 (1973). On appeal, Buckland attempts to show that Castle's condition of toxemia, for which she was hospitalized four days before the child's birth, could have caused premature labor and delivery, but no such evidence was offered in the trial court. We hold the court committed no error in establishing the period of possible conception absent evidence of a pregnancy of shorter duration than normal. Moreover, the only evidence was that Castle discovered she was pregnant in June and so informed Buckland during that month. Accordingly, any evidence of sexual activity thereafter by Castle was irrelevant and inadmissible.

██ We agree with Buckland, however, that § 20-61.1 made inadmissible any testimony that Buckland had admitted paternity to Castle and her parents. But we conclude that admission of this evidence was harmless error. The jury was instructed that paternity could be shown only by one of the methods outlined in § 20-61.1 and that the proof must be beyond a reasonable doubt. We will not assume that the jury disregarded the court's instruction. *See Jackson* v. *Commonwealth*, 218 Va. 490, 493, 237 S.E.2d

791, 793 (1977). The blood tests established a 99.72% probability that Buckland was the child's father, and this evidence alone proved Buckland's paternity beyond a reasonable doubt.

Concluding as we do that the only error committed in the case was harmless, we will affirm the judgment of the trial court.

*Affirmed.*