# ERICA HANKERSON, ETC.

v.

# ERIC O. MOODY

Record No. 812211

Decided April 26, 1985, at Richmond

Present: All the Justices

*Gregory A. Giordano (Thomas B. Shuttleworth; Clark & Stant, P.C.*, on brief), for appellant.

*(James A. Winstead*, on brief), for appellee. Appellee submitting on brief.

COCHRAN, J., delivered the opinion of the Court.

Etta Hankerson filed a petition in 1980 in the juvenile and domestic relations district court under Code § 20-61.1[1] against Eric O. Moody for support of her daughter, Erica, born out of wedlock. Petitioner alleged that Moody was the child's father. Under court order, the mother, child, and putative father submitted to blood grouping tests, but the court refused admission of the test results and dismissed the petition.

On appeal to the circuit court, an amended bill of complaint was filed by Erica Hankerson, by her next friend, Etta Hankerson, against Moody. The court ruled that the results of the blood grouping tests were admissible under the provisions of Code § 20-61.2.[2] Over Moody's objection, the test results and the testimony

---

[1] In 1981, § 20-61.1 provided:

**§ 20-61.1. Support of children of unwed parents by father; evidence of paternity.** — Whenever in proceedings hereafter under this chapter concerning a child whose parents are not married, a man admits before any court having jurisdiction to try and dispose of the same, that he is the father of the child or the court finds that the man has voluntarily admitted paternity in writing, under oath, or if it be shown by other evidence beyond reasonable doubt that he is the father of the child and that he should be responsible for the support of the child, the court may then enter and enforce judgment for the support, maintenance and education of such child as if the child were born in lawful wedlock.

Such other evidence that the man is the father of the child shall be limited to evidence of the following:

(1) That he cohabited openly with the mother during all of the ten months immediately prior to the time the child was born; or

(2) That he gave consent to a physician or other person, not including the mother, charged with the responsibility of securing information for the preparation of a birth record that his name be used as the father of the child upon the birth records of the child; or

(3) That he allowed by a general course of conduct the common use of his surname by the child; or

(4) That he claimed the child as his child on any statement, tax return or other document filed and signed by him with any local, State or federal government or any agency thereof.

. . . .

[2] In 1981, § 20-61.2 provided:

of expert witnesses who conducted and interpreted the tests were admitted.

After Hankerson's evidence had been completed, the court denied Moody's motion to strike the evidence. However, before Moody presented any evidence, the trial court ruled that Hankerson's evidence was insufficient and entered judgment in favor of Moody. Hankerson challenges this ruling; Moody has assigned no cross-error to the court's ruling that the results of the blood grouping tests and related testimony were admissible in evidence.

Michael Dana Corby, a laboratory supervisor at Norfolk General Hospital, performed blood grouping tests, including HLA tests,[3] on blood samples from the mother, child, and putative father. The court found him qualified to testify concerning the tests he performed. Corby detailed the testing procedures used. He testified that the tests were performed and the results were transcribed accurately. He explained the controls that were used to prevent contamination or error.

Dr. Mary Sue Leffell, director of the laboratory at Norfolk General Hospital and an assistant professor at Eastern Virginia Medical School, and Dr. Eugene R. Heise, associate professor of immunology and director of the medical immunology laboratory at Bowman Gray School of Medicine, Winston Salem, North Carolina, analyzed the results of the tests. Both Leffell and Heise were admitted as experts in the field of genotypic blood testing.

Leffell and Heise also described the controls used to insure against contamination or testing error. They indicated that HLA testing is accepted as reliable in the scientific and medical communities and is used in the United States, Europe, and other parts

---

In the trial of any divorce or support proceedings in any court in which the question of paternity arises, regardless of any presumptions with respect to paternity, the court before whom the matter may be brought, upon motion of either party, may direct and order that the alleged father, the mother and child shall submit to a blood grouping test; provided, that the court, in its discretion, may require the person requesting the blood grouping test to pay the cost thereof. The results of such blood grouping test shall be admitted in evidence when offered by a duly licensed practicing physician or other qualified person.

[3] HLA testing involves an analysis of genetically-transmitted antigens on the white blood cells of the child, mother, and putative father. The test may either exclude the man as the child's father or achieve a statistical calculation of the probability of his paternity if he cannot be excluded. *See Jones* v. *Robinson*, 229 Va. 276, 280-81, 329 S.E.2d 795, 797-98 (1985) (explaining HLA tests). *See also Buckland* v. *Commonwealth*, 229 Va. 290, 329 S.E.2d 803 (1985) (this day decided).

of the world to establish paternity. They testified that, although blood grouping tests were initially effective only to exclude an alleged father, developments in the field since the 1950s now allow inclusion of putative fathers to high degrees of probability. Leffell, characterizing the HLA test as the "single most powerful system," testified that it had been used in the United States since the mid-1970s, in Europe for a longer period, to determine paternity.

Conceding that the HLA tests could never be 100% conclusive of a child's paternity, both Leffell and Heise found a 99.95% probability that Moody was the father of Hankerson's child. He and the child each possessed two rare antigens not found in the mother. Heise provided an additional calculation which revealed that, if the evidence should show that Hankerson had sexual intercourse with men in addition to Moody during the period of conception, Moody's likelihood of paternity would be reduced only marginally, to 99.89%. Both Leffell and Heise testified to their belief beyond a reasonable doubt that Moody was the child's father.

Etta Hankerson, the child's mother, testified that she had sexual intercourse only with Moody during the entire year prior to the child's birth on July 27, 1978. During the period of conception, she had a close relationship with Moody, sometimes seeing him every day of the week and having intercourse with him two to three times a week. When she first told Moody of the pregnancy, he did not deny paternity and indicated she could keep the baby. He later urged her to have an abortion. Hankerson and Moody stopped seeing each other socially when she was about four months pregnant. During this time, "his whole attitude had changed." When the pregnancy had progressed to five or six months, he first questioned that he was the child's father.

On cross-examination, Hankerson testified that she had two other children, ages 13 and 11, born out of wedlock. She had seen neither father in recent years or during the period of this child's conception. She testified that she receives support for the second child from the child's father. She denied that she had sexual intercourse with other men during periods relevant to these proceedings. She also denied that she had harassed Moody, although she conceded that after the child's birth she was ordered by a court not to go to his office. She conceded that Moody had taken no action that would allow her to prove the child's paternity by the methods set forth in § 20-61.1.

We have this day held that § 20-61.1, before it was amended in 1982, was unconstitutional because it discriminated against illegitimate children by denying them a reasonable opportunity to assert support claims against their fathers in violation of the Equal Protection Clause of the Fourteenth Amendment. *Jones v. Robinson*, 229 Va. 276, 287, 329 S.E.2d 795, 802 (1985). As a consequence, trial courts, in the exercise of equity powers, could admit any probative evidence, including the results of blood grouping tests, to determine paternity by a preponderance of the evidence. We pointed out that § 20-61.1 was the statute controlling the determination of paternity but that in view of the unconstitutionality of the statute, civil nonsupport proceedings could be conducted under the provisions of Code § 16.1-241 for the benefit of illegitimate as well as legitimate children, and in such proceedings the issue of paternity could be determined. Therefore, the results of the blood grouping tests were admissible in this case. The scientific reliability of the tests was described by three expert witnesses. Moreover, the General Assembly has endorsed the HLA test as a viable method of proving paternity by including it in § 20-61.1 in 1982 as acceptable evidence. Acts 1982, c. 307. The sole issue on appeal, therefore, is whether the trial court, as the trier of fact, arbitrarily disregarded the uncontradicted testimony of unimpeached witnesses.

A trial court's findings of fact are given the same weight as jury findings. *Morris* v. *Mosby*, 227 Va. 517, 522, 317 S.E.2d 493, 497 (1984); *Reiber* v. *Duncan*, 206 Va. 657, 660, 145 S.E.2d 157, 160 (1965). The judgment of the court sitting without a jury will not be set aside unless it is plainly wrong or without evidence to support it. Code § 8.01-680; *see Allsbrook* v. *Azalea Radiator Ser.*, 227 Va. 600, 602, 316 S.E.2d 743, 744 (1984); *Pugh* v. *Commonwealth*, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982). However, a trial court's conclusion based on evidence that is "not in material conflict" does not have this binding effect on appeal. *Durrette* v. *Durrette*, 223 Va. 328, 332, 288 S.E.2d 432, 434 (1982); *Clark* v. *Clark*, 209 Va. 390, 395, 164 S.E.2d 685, 689 (1968). The trier of fact must determine the weight of the testimony and the credibility of the witnesses, but it "may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record." *Cheatham* v. *Gregory*, 227 Va. 1, 4, 313 S.E.2d 368, 370 (1984). A court may not base its findings on a

suspicion which is contrary to the undisputed positive testimony. *Id.*

The unrefuted testimony before the court established that the blood tests constituted a reliable method of proving paternity, were performed properly and recorded accurately, and resulted in a 99.95% rate of probability that Moody was the father of Hankerson's child. Also undisputed was Hankerson's testimony that she had sexual intercourse with no one other than Moody during the year prior to the child's birth. We will assume, without deciding, that the evidence justified an inference that Hankerson, with her history of bearing children out of wedlock, had sexual relations with others during this time. Nevertheless, even with such an inference of Hankerson's promiscuity, the probability of Moody's paternity, according to the expert testimony, would only be reduced to 99.89%.

Although the HLA tests admittedly cannot conclusively prove paternity, Hankerson was not required to prove her case beyond any doubt or even beyond a reasonable doubt. The proper standard of proof at a time when § 20-61.1 was inapplicable because of constitutional deficiency was proof by a preponderance of the evidence. *See Jones* v. *Robinson,* 229 Va. at 276, 329 S.E.2d at 795. Here, there was testimony from experts that paternity was established beyond a reasonable doubt. The evidence was more than sufficient to meet the lower standard of proof by a preponderance of the evidence, and there was no evidence to the contrary. Under these circumstances, we hold that the trial court arbitrarily disregarded the undisputed evidence which established Moody's paternity. Accordingly, we will reverse the judgment of the trial court and remand the case for a determination of the proper amount of support to be paid by Moody for the benefit of his child.

*Reversed and remanded.*