THOMAS J. CAMP

v.

COMMONWEALTH OF VIRGINIA

No. 1021-90-1

Decided July 28, 1992

COUNSEL

Guilford D. Ware (Martha M. Poindexter; Crenshaw, Ware & Martin, on brief), for appellant.

Michael T. Judge, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

BAKER, J.—Thomas J. Camp (appellant) appeals from his bench trial conviction by the Circuit Court of Virginia Beach (trial court) for violation of Code § 29.1-738(A). That Code section provides:

> § 29.1-738. Operating boat or manipulating water skis, etc., in reckless manner or while intoxicated, etc. — A. No person shall operate any motorboat or vessel, or manipulate any skis, surfboard, or similar device, or engage in any spearfishing while skin diving or scuba diving in a reckless manner so as to endanger the life, limb, or property of any person.

Among other alleged errors, appellant asserts that the trial court erroneously declined to strike the Commonwealth's evidence. Because we agree that the evidence is insufficient to prove beyond a reasonable doubt that appellant was guilty of a criminal offense, we reverse the conviction and dismiss appellant from further prosecution. In view of our decision, we need not address the other issues raised by this appeal.

■ On appeal, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). However, while we view the evidence in that light, the burden remains on the Commonwealth to produce evidence consistent with guilt of a crime and inconsistent with innocence. *See Cameron v. Commonwealth*, 211 Va. 108, 175 S.E.2d 275 (1970).

The record discloses that on July 30, 1989, a bright, clear, calm Sunday, Dr. Richard J. Seeley, his wife and Mr. and Mrs. Joe Foulkes were returning ashore from a Chesapeake Bay cruise on Dr. Seeley's boat. As they approached the channel leading under

the Lesner Bridge, Dr. Seeley sighted a Grady-White boat operated by appellant between three and four hundred yards to his right. Dr. Seeley did not see the Grady-White again until after the boats collided; however, as he neared the bridge, Dr. Seeley observed two powerboats coming toward him at a high rate of speed. Two seconds later, Dr. Seeley heard Mrs. Foulkes say: "What is he going to do? What is he doing? Is he going to hit us?" At that moment, Dr. Seeley felt the stern of his boat go down and he was pushed to the left. He subsequently heard someone on the Grady-White say that it had collided with his boat.[1]

Mr. Foulkes testified that he also had seen the Grady-White off to the right and had no reason to believe there was any danger of a collision between the two boats. He did not see the Grady-White again until after the collision. He said that things happened "very rapidly" and that they could not see what the Grady-White was doing, only that suddenly there was a "crunch." He also heard a voice from the Grady-White say that it had collided with the Seeley boat.

Mrs. Foulkes testified that when she first saw the Grady-White it was a good distance to her right "going awfully fast," but that it seemed far enough away "that there wasn't apparently any kind of a problem." When she next saw the Grady-White, it was "in back of us," approximately twenty-five feet away. She was unable to estimate the Grady-White's speed at that time but indicated that it struck the Seeley boat at an angle. Mrs. Foulkes did not say that she saw the powerboats or the wake caused by their speed. Her testimony does not contradict Dr. Seeley's statement that he heard her exclamations seconds after he sighted the approaching powerboats.

Virginia Beach marine patrol police officer Larry Willis testified that he interviewed appellant at the dock shortly after "this boating accident." Willis gave this account of his interview with appellant, which occurred at the dock immediately following the accident.

I asked Mr. Camp what had happened. He stated that they had been out fishing; that they had left Little Creek and

---

[1] At this time, Mrs. Seeley disappeared into the water. Subsequently, she was found, placed in the Grady-White and taken ashore where she was pronounced dead.

were on their way back to Lynnhaven Inlet, coming up through the small boat channel which runs parallel to the beach.

As they approached the Lynnhaven Inlet marker channel, he stated to me that he observed Mr. Seeley's boat in the channel. He proceeded to pull into the channel area behind Dr. Seeley, pulled up behind Dr. Seeley's vessel and proceeded to pass on the port side.

He stated that he observed two fast powerboats coming out of the channel. As he proceeded to pull out, he determined that there was not enough room between his boat, Dr. Seeley's boat, and the vessels that were coming out to pass safely. He pulled back in behind Dr. Seeley. He stated that the boat wakes from the two boats coming out washed up off his boat across the stern of Dr. Seeley's boat. And he then passed on the starboard side, the right side, of Dr. Seeley's boat and attempted to back down to full power, but the momentum of the vessel was too great.

Willis identified a picture, Commonwealth's Exhibit #4, showing the right-hand stern section of the Seeley boat. He noted the picture depicted damage to the seat cushion and railing caused by the collision. He saw no damage to the Grady-White. Willis further stated that he personally knew appellant had a good reputation as a boat operator and that there were no posted speed limits in the area but there were several "no wake" signs. Willis did not assert that appellant was speeding or had himself caused an excessive wake. Approximately two weeks later, Willis issued a summons against appellant.

The Commonwealth called Coast Guard Master Chief Petty Officer Stone who related undisputed rules of the road. He stated that in this case he did not know how far the Grady-White was behind the Seeley boat and could not say whether a safe situation existed at the time of the accident. He said that the rules do not specify either speed or distance, but only that you should not put yourself in harm's way. According to the rules stated by Stone, when the operators of the Grady-White and Seeley boat first viewed each other, the Grady-White was the "privileged vessel."

Seeking trial court approval to permit the introduction into evidence of a videotaped interview of appellant made several days after the event by a news reporter, the Commonwealth represented to the trial court that it would show appellant stated "[h]e was in *a hurry* to clean fish, getting back." Over the objection of appellant, the trial court admitted the tape. The tape fails to support the Commonwealth's representation that appellant declared he was "in a hurry." It merely factually states what appellant and his fellow passengers were doing:

> We had a long day on the water and we wanted to get back in there and get the boat cleaned up and get the fished [sic] cleaned and get on our merry way. When I looked past him, I seen the other boat coming, and I slowed down and his wake pushed me into the other boat.

Thereafter, the Commonwealth rested and appellant moved to strike the Commonwealth's evidence and dismiss the charge.

After the trial court overruled appellant's motion to strike, consistent with his videotaped interview and statement made to Willis, appellant explained that the cause of the accident was the wake created by the excessive speed of the powerboats, estimated to be as much as forty miles per hour in a no wake zone.

Appellant's witnesses confirmed the speed of the powerboats and wake resulting therefrom. They also confirmed Willis' statement that there was no visible damage to the Grady-White and that no impact of the collision was felt by any of them.

Paul Brown, the owner of the Grady-White, also confirmed that when the operators first sighted each other the Grady-White was the privileged vessel, yet appellant slowed to permit the Seeley boat to pass in front of him. He further specifically stated that the powerboats' wake had "blown" the Grady-White to the right, across the stern of the Seeley boat.

There is little disagreement among the witnesses who were present at the scene which gave rise to the charge that appellant recklessly operated the Grady-White. There is evidence that the bow of the Grady-White came over the stern of the Seeley boat. There is no evidence of the Grady-White's speed immediately before that incident. Appellant stated that he had cut his engines

and attempted to reverse them. The lack of precise explanation is understandable as everyone agreed the entire accident happened suddenly, without expectation. The only evidence of how far the Grady-White protruded onto the Seeley boat is the Commonwealth's Exhibit #4, which disclosed damage to the back of a seat located at the aft of that boat. There is no showing that damage protruded into the interior side of that seat.

There is evidence that Mrs. Seeley "flipped over as she was going over the side backwards." A reasonable hypothesis is that her fall may have been caused by the large wake created by the excessive speed and turn of the powerboats. Either of two possibilities shown by the Commonwealth's evidence may have caused Mrs. Seeley to fall from her boat. One would be the impact of the collision, the other the wake alone. If the latter were the cause, Mrs. Seeley would have fallen even if the Grady-White had not been present. If the former were the cause, it is reasonable to infer the Grady-White was driven into the Seeley boat by the wake created by the powerboats. In either case, a reasonable hypothesis of innocence is shown by the Commonwealth's evidence.

■ Where, as here, the Commonwealth's evidence established that the wake created by the powerboats is just as likely to have been the cause of the impact as was the operation of the Grady-White, the Commonwealth has failed to produce evidence consistent with guilt of the crime charged and inconsistent with innocence.

> It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt. It must exclude every reasonable hypothesis except that of guilt. The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence.

*Cameron*, 211 Va. at 110-11, 175 S.E.2d at 276 (citations omitted). We find that the Commonwealth has not met its burden to prove beyond a reasonable doubt that appellant violated the provisions of Code § 29.1-738(A).

Accordingly, for the reasons stated, the judgment of the trial

court is reversed and appellant is dismissed from further prosecution on this charge.

*Reversed and dismissed.*

Duff, J., and Willis, J., concurred.