## Norfolk

### DAVID I. WYNNE

v.

### COMMONWEALTH OF VIRGINIA

No. 0035-91-1

Decided November 9, 1993

COUNSEL

Frank K. Friedman (William B. Poff; Woods, Rogers & Hazlegrove; Franklin A. Swartz, Calvin A. DePew, Jr.; Rabinowitz, Rafal, Swartz & Gilbert, P.C., on briefs), for appellant.

Virginia B. Theisen, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**WILLIS, J.**—On appeal from his bench trial conviction of obtaining money by false pretenses in violation of Code § 18.2-178, David I. Wynne contends (1) that the evidence was insufficient to prove that he made false statements rising to the level of fraud, (2) that the evidence was insufficient to prove that any allegedly false statements made by him induced Sumitomo, Inc. to make its contribution, and (3) that the evidence was insufficient to prove that he intended to defraud. We find no error and affirm the judgment of the trial court.

> On appeal [of a criminal conviction], we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

*Josephs v. Commonwealth,* 10 Va. App. 87, 99, 390 S.E.2d 491, 497 (1990) (en banc).

On July 2, 1988, as Mayor of the City of Chesapeake, Wynne entertained officials from the Chinese Embassy. The city reimbursed him for the cost of food served but, consistent with city policy, refused to pay for alcoholic beverages. The Chamber of Commerce reimbursed Wynne for the alcoholic beverages. On October 5, 1989, the city gave and paid the full costs of a reception for the Austrian Ambassador. The Chinese and Austrian receptions were the only occasions on which foreign dignitaries were entertained officially while Wynne served as Mayor of Chesapeake.

Betty Calloway, City Clerk since 1982, testified that she handled travel arrangements for the Mayor and the members of the City Council. Upon submitting receipts for expenses connected with official travel, the traveler was reimbursed. The city also provided travel advances. The unused portion of any travel advance was to be returned to the city.

In June, 1989, Wynne attended a Mayor's Conference in Charleston, South Carolina. The city advanced him $1,100 against the expenses of this trip. The expenses totaled only $246.49, and he owed the city a refund of $853.51. In September, 1989, the city advanced Wynne $375 for travel to Washington, D.C. and $405 for travel to

New Orleans. His expenses on these trips fell short of the advances. He owed the city refunds of $287.64 for the Washington, D.C. trip and $268.07 for the New Orleans trip.

Upon Wynne's return from the trips, Ms. Calloway reminded him that he was required to submit his expenses and to repay any amounts that he owed the city. In December 1989, she told him that the city's finance department had inquired about the reimbursement. On December 12, 1989, Wynne told Ms. Calloway that he had lost the hotel bill from Charleston and asked her to get another one. She did so. At the same time, he told her that he expected to receive some money and that he would then repay the city.

On December 11, 1989, Wynne met with Mr. Imai and Mr. Enoki, local executives of the Mitsubishi Kasei Corporation of Tokyo. He told them that he needed money for entertainment and travel expenses that the city would not reimburse because of its limited budget. He did not tell them that he owed the city money. He told them that he had established a fund called Friends of David Wynne through which he had raised approximately $18,000 to $20,000 in the last year or two. He said that individual businesses gave between $3,000 and $5,000. He asked that Kasei contribute to that fund.

In late November or early December, 1989, Wynne arranged a December 12 meeting with Mr. Yamazaki and Mr. Cali of Sumitomo, Inc. Lynne Jenkins, Wynne's fund-raiser, also attended the meeting. At the meeting, Wynne told the Sumitomo executives that he was seeking private contributions to help defray the costs of entertaining foreign dignitaries. He told them that in the previous year he had solicited about $15,000 from various corporations, and that a company usually gave between $1,000 and $5,000.

The Sumitomo executives decided to make a contribution. Mr. Cali's secretary called and was told by Lynne Jenkins that the contribution check should be made payable to "Friends of David Wynne 1990." Because this designation sounded like a political contribution and Sumitomo did not make political contributions, Mr. Cali sent Sumitomo's $1,000 contribution in the form of a check made payable to "Mayor David Wynne." A letter attached to the check noted that the money was "to help defray your expenses entertaining foreign dignitaries." Wynne acknowledged the check, writing to Mr. Cali:

> Thank you very much for your assistance in defraying some of the costs of the office. As you know, there are expenses from time to time relating to official travel and entertainment.
>
> Last year we entertained officials from the Chinese Embassy. The costs of the evening were underwritten in part by the Chamber and members of the business community. Since the city adopted very strict requirements on these expenses, it has been necessary to use private funds on occasion.

Mr. Yamazaki testified that Sumitomo would not have contributed funds to discharge Wynne's personal debt.

Betty Calloway testified that she saw the Sumitomo check and letter when they arrived in the office on January 15 or 16, 1990. She noticed that the letter stated that the check was to defray the expenses of entertaining foreign dignitaries. She testified that on January 18, 1990 Wynne told her that he was going to use the Sumitomo check to repay his travel debt. He asked whether he could endorse the check to the city. Ms. Calloway stated that she preferred that he write another check. On January 19, 1990, Ms. Calloway asked for the Sumitomo letter so that she could make a copy for her files, the normal procedure. Wynne told her that he had thrown it out in the trash.

On January 19, 1990, Wynne opened a bank account entitled "Friends of Mayor Wynne 1990." He deposited the Sumitomo check and received back $100 cash. On the same day, from that account, he reimbursed the city $853.51, the unused portion of the Charleston advance.

Code § 18.2-178 provides:

> If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof; or if he obtain, by any false pretense or token, with such intent, the signature of any person to a writing, the false making whereof would be forgery, he shall be guilty of a Class 4 felony.

To sustain a conviction of larceny by false pretenses, the Commonwealth must prove: (a) that the accused intended to defraud; (b) that a fraud actually occurred; (c) that the accused used false pretenses to perpetrate the fraud; and (d) that the false pretenses induced

the owner to part with his property. *Riegert v. Commonwealth,* 218 Va. 511, 518, 237 S.E.2d 803, 807 (1977); see also *Lund v. Commonwealth,* 217 Va. 688, 232 S.E.2d 745 (1977); *Watson v. Commonwealth,* 4 Va. App. 450, 358 S.E.2d 735 (1987).

Wynne first contends that the evidence failed to prove that he made false statements rising to the level of fraud. The record does not support this contention. Wynne specifically told the representatives of both Kasei and Sumitomo that he needed contributions to defray unreimbursed expenses incurred by him in entertaining foreign dignitaries. He specifically referred to the Chinese delegation. Yet, the evidence established that Wynne had been fully reimbursed for all expenses incurred by him in entertaining foreign dignitaries. The city paid all expenses in connection with entertaining the Austrian Ambassador. The city and the Chamber of Commerce paid all expenses in connection with the Chinese reception.

Wynne also told the representatives of Kasei and Sumitomo that he had previously established funds and had received contributions from private businesses to assist in entertaining foreign representatives. This was untrue. Although the Chamber of Commerce, an agency supported by private business, had paid some of the costs of the Chinese reception, Wynne expressly and falsely asserted that both the Chamber and private businesses had contributed. He went so far as to specify the monetary range into which most private business contributions fell. That Wynne made the false representations for the purpose of obtaining money is obvious from his solicitation and acceptance of the resulting contribution.

Wynne next contends that the evidence failed to prove that any allegedly false statements made by him induced Sumitomo to make its contribution. The record denies this contention. Sumitomo's representatives testified that Wynne solicited their aid for the express purpose of defraying otherwise unreimbursable expenses incurred by him in entertaining foreign dignitaries. They testified that Sumitomo's contribution was made for that express purpose. They testified that Wynne did not tell them that he was indebted to the city and that they would not have made a contribution to repay his debt to the city. Mr. Cali's January 12, 1990 letter, which accompanied Sumitomo's check, and Wynne's January 19, 1990 letter of acknowledgment confirm this understanding.

Finally, Wynne contends that the evidence failed to prove his intent to defraud. Again, this contention is refuted by the record. Pressed by the city for reimbursement of the unused travel advances, Wynne initiated contact with the representatives of Kasei and Sumitomo. He solicited their contributions with false statements of official need. When they indicated interest in making contributions, Wynne told Ms. Calloway that he was expecting money and that when he received it, he would pay his debt to the city. When Sumitomo's contribution arrived, Wynne told Ms. Calloway that he would use it to pay that debt and, in fact, did so. This evidence supports the trial court's determination that Wynne solicited money from Sumitomo not for the purpose stated, but for the purpose of satisfying his private debt.

Wynne's need for money, his false representations to the representatives of Kasei and Sumitomo, and his prompt application of Sumitomo's contribution to his personal use prove his intent to defraud. His successful solicitation of money upon a false statement of fact proves the actual accomplishment of a fraud. His successful solicitation of money through false assertions of fact and a false statement of purpose proves the use of false pretenses to perpetrate the fraud. The testimony of Sumitomo's representatives proves that the false pretenses induced Sumitomo to make its contribution, thereby parting with its property.

The judgment of the trial court is affirmed.

*Affirmed.*

Baker, J., concurred.

Koontz, J.,* dissenting.

I respectfully dissent. In my view, although the facts in this case and the reasonable inferences fairly deducible therefrom are consistent with Mayor Wynne's guilt of a violation of Code § 18.2-178, they are not inconsistent with his innocence. Accordingly, under well established principles, I would find that the Commonwealth failed to establish Mayor Wynne's guilt beyond a reasonable doubt and would reverse his conviction.

*When the case was argued, Judge Koontz presided. Judge Moon was elected Chief Judge effective May 1, 1993.

"On appeal, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. However, while we view the evidence in that light, the burden remains on the Commonwealth to produce evidence consistent with guilt of a crime and inconsistent with innocence." *Camp v. Commonwealth,* 14 Va. App. 879, 880, 419 S.E.2d 435, 436 (1992) (citation omitted). Thus, "to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt. It must exclude every reasonable hypothesis except that of guilt. The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence." *Cameron v. Commonwealth,* 211 Va. 108, 110-11, 175 S.E.2d 275, 276 (1970). Although the judgment of the trial court sitting without a jury will not be set aside unless it is plainly wrong or without evidence to support it, a trial court's conclusion based on evidence that is undisputed does not have this binding effect on appeal. The trial court may not arbitrarily disregard uncontested evidence of unimpeached witnesses unless the evidence is inherently incredible and inconsistent with the facts in the record. *Hankerson v. Moody,* 229 Va. 270, 274, 329 S.E.2d 791, 794 (1985).

In the present case, at the conclusion of the presentation of the evidence, the trial judge made the following pertinent observations and conclusions:

I really feel sorry for Mr. Wynne. I think he is a man that used extremely poor judgment.

\* \* \*

One piece of evidence that came out that impressed me very much is when Mr. Wynne said that he picked up from other mayors at these mayor conferences how they raised money, and I think we have all heard what goes on in a lot of other states, how people get businesses for so called contributions. I would like to think that those things don't go on in Virginia. I certainly don't think it is a general practice in this state, but regardless of that, it is wrong.

What the mayor did was to me very definitely wrong. But, of course, it is not up to me to decide just what he did was wrong. It is up to me to decide were his acts a violation of the statute which he is being prosecuted. And it really boils down to the fact

was there intent to defraud and were false pretenses used in order to obtain this money.

In that context, the trial judge then essentially determined that the unused portion of the several travel and expense advances received by Mayor Wynne from the city were "personal debts." Thus, when Mayor Wynne "went to the Japanese company who he was familiar with to obtain money to pay this debt" that established "an intent to defraud." The majority, for the reasons stated in its opinion, finds the evidence sufficient to support the trial judge's implicit determination that: (1) Mayor Wynne intended to defraud Sumitomo, Inc.; (2) that a fraud actually occurred; (3) that Mayor Wynne used false pretenses to perpetrate the fraud; and (4) that the false pretenses induced Mr. Yamazaki on behalf of Sumitomo, Inc. to part with its money. *See Riegert v. Commonwealth,* 218 Va. 511, 518, 237 S.E.2d 803, 807 (1977). I disagree.

The trial judge's observations that Mayor Wynne "used extremely poor judgment" and that what he did in soliciting private funds was "wrong" are patently obvious in the context of the facts in this case. Undoubtedly, the mayor's actions were the genesis of the reasonable suspicion of criminal conduct that led to Mayor Wynne's prosecution and, ultimately, to his conviction. The solicitation of private funds to defray the legitimate official expenses of a public official is not itself a crime in this Commonwealth. However, such a practice casts a cloud of public doubt and suspicion over the validity of the solicitation and the expenditure of such funds for legitimate official purposes. Moreover, such a practice erodes the public respect for and the dignity of the public office involved. In this light, I agree with the trial judge's conclusion that such conduct is "wrong." My disagreement with the validity of Mayor Wynne's conviction does not spring from any defense of his solicitation of private funds to defray even the legitimate costs of the operation of his office as mayor. I write solely in defense of the requirement that guilt of a criminal offense must be established beyond a reasonable doubt, a requirement forming the very foundation of our judicial system and essential to public confidence in it.

Mayor Wynne did not solicit funds in a vacuum, and his conduct may not properly be so viewed to establish his guilt of a violation of Code § 18.2-178 beyond a reasonable doubt. No assertion is made that Mayor Wynne solicited funds for personal obligations totally unrelated to the expenditures of his official office. The gravamen of the Commonwealth's assertion of criminal conduct against Mayor Wynne

is that the unused portions of the travel advances following his participation in official meetings in Charleston, Washington, D.C., and New Orleans became "personal debts" owed to the city by Mayor Wynne. However, any distinction between the personal debt of Mayor Wynne and his debt to the city in his official capacity as mayor under such circumstances is a distinction totally without significance. Clearly, Mayor Wynne had an obligation to settle his outstanding account with the city in the amount of his unused travel advances.

However, it is undisputed that Mayor Wynne, over the course of his tenure as mayor, did not regularly settle his accounts with the city. Rather, he had a practice of doing so every four to seven months. Although he never failed to repay his advances in full, it is also undisputed that, frequently, he did not seek reimbursement for official expenses that otherwise were reimbursable to him by the city. Betty Callaway, the City Clerk responsible for handling official travel advancements and settlements, specifically testified that she was aware that there were times that Mayor Wynne was entitled to take mileage and other expenses for which he did not make claims. In fact, she told him that "he was losing money because he was not claiming his mileage." Ms. Callaway testified for the Commonwealth. Her testimony is consistent with Mayor Wynne's assertion that over the period of time he incurred the obligation to repay the unused portions of his travel advances related to his official trips to Charleston, Washington D.C., and New Orleans, he was also incurring and accumulating reimbursable travel and expenses related to his other official functions as mayor. At trial, those expenses were established and not refuted by the Commonwealth.

It is significant that the trial judge, although condemning it, accepted Mayor Wynne's account that when he attended mayor's meetings, such as the national meeting in Charleston, South Carolina, in 1989, he learned from other mayors that they frequently followed a practice of raising "money to defray part of their financial expenses." No evidence in the record suggests that such a practice is prohibited by law or not followed by some mayors in other states. The trial judge's condemnation of the practice of public officials raising money from private business to pay for official expenses is not a rejection of Mayor Wynne's assertion that upon learning of the practice of other mayors he believed this practice was permissible in this Commonwealth and decided to begin the practice here. Mayor Wynne's account is not inherently incredible or inconsistent with any other facts in the record. The fact that adequate city funds were available to pay the expenses of

Mayor Wynne in his official capacity merely established that the solicitation of private funds was not necessary. It does not necessarily exclude the reasonable hypothesis that Mayor Wynne nevertheless believed that such solicitation was permissible and that his intent was to raise money from private businesses to defray the costs related to his official function as mayor.

Mayor Wynne's assertion of a belief that solicitation of private funds to defray official expenses of his office was not prohibited is the basis of his further assertion that he had no intent to defraud Sumitomo, Inc. The undisputed facts surrounding his actual solicitation of funds from Sumitomo, Inc. and his disposition of those funds is not inconsistent with a lack of intent to defraud. The meeting with the Sumitomo executives was held in the presence of Mayor Wynne's fund raiser, Lynne Jenkins. It was not a secret meeting. Mayor Wynne and Sumitomo, Inc. had an ongoing business relationship through Mayor Wynne's leasing business. The meeting lasted "ten to fifteen minutes." After "some conversation in general matters of Virginia and just Chesapeake," Mr. Yamazaki, Sumitomo's president, recalled that "at the last minute Mayor [Wynne] discussed about funds, and it was a very short conversation." Although Mr. Yamazaki was given or formed the impression that the city had a limited budget for the mayor's expenses and the mayor mentioned the entertainment of foreign dignitaries as one example of the need for funds, Mr. Yamazaki testified that he "never asked [the] specific purpose" of the requested funds and that Mayor Wynne did not "[express] it to me."

Undoubtedly, Mr. Yamazaki made it clear to Mayor Wynne that the contribution was not to be a political gift or for personal expenses. When asked if Mayor Wynne had come to him and said he owed the city money for travel expenses he would have given Mayor Wynne the money, Mr. Yamazaki testified: "Travel expenses? That (sic) his personal trouble. His wife and kids, no, I don't, but if trouble as the mayor of the city, yes." Although Mayor Wynne bears the responsibility, Mr. Yamazaki's testimony is not inconsistent with a conclusion that the meeting produced a lack of clear understanding of the intended use of the funds. However, that result is not inconsistent with a lack of intent to defraud based upon a good faith belief that the use of the funds to defray the cost of official travel was not prohibited by law. In fact, Mr. Yamazaki's testimony in reply to the Commonwealth's question suggests that he was willing to have the contribution used to

repay the city for the costs of Mayor Wynne's travel on official business so long as Mayor Wynne's family travel expenses were not included.

Finally, as noted by the majority, when Mayor Wynne received the $1,000 check from Sumitomo it was accompanied by a letter that indicated it was "to help defray your expenses entertaining foreign dignitaries." Mayor Wynne acknowledged receipt of the check and in his letter of acknowledgement he referred to "official travel." Although the Commonwealth makes much of the admittedly confusing and perhaps misleading conclusion that may be drawn from the wording of this letter, it is, nevertheless, not inconsistent with a desire by Mayor Wynne to clarify his intent to use the contribution to defray the costs of his official travel. Moreover, Mayor Wynne's open use of these funds for the purpose of repaying the unusual portion of his travel advance relating to his official travel while not claiming reimbursement for other accumulated reimbursable expenses is not inconsistent with a good faith belief that such a practice merely shifted the cost of his official travel from the city to private contributions. Such a belief is not inconsistent with a lack of intent to defraud.

When Mayor Wynne's conduct is viewed in its totality, a reasonable hypothesis of innocence that is not inherently incredible and not inconsistent with the facts in the record viewed most favorable to the Commonwealth becomes apparent. That hypothesis is that Mayor Wynne after learning of the practice of other mayors from other states sought to obtain private funds to defray, in part, the expenses of his official office so that he would not have to personally bear that expense and he could relieve the city of some of that expense. By not seeking reimbursement from the city for his accumulated reimbursable expenses as either a reduction to or set-off against the unused portion of the travel advance he had received and owed to the city, he sought to accomplish that transfer without a personal financial gain. However "poor judgment" such conduct evidences, it is not inconsistent with a lack of intent to defraud Sumitomo.

For these reasons, I would reverse the conviction in this case.