**Norfolk**

E. HAWLEY BROOKS

v.

CAROLYN M. ROGERS

No. 2332-92-1

Decided July 5, 1994

COUNSEL

Susanne L. Shilling (Lucy E. Nichols; Shilling & Associates, on briefs), for appellant.

Barton N. Daniel (Paul M. Lipkin; Decker, Cardon, Thomas, Weintraub, Coureas & Huffman; Goldblatt, Lipkin & Cohen, on brief), for appellee.

OPINION

**BRAY, J.**—E. Hawley Brooks appeals the finding by the trial court that he is the biological father of Baby Doe (infant) and the related order that he pay child support of $1213.50 per month. He argues that the evidence was insufficient to determine paternity and that the court erroneously imputed income to him in fixing the support obligation. For the reasons which follow, we affirm in part and reverse in part.

" 'Under familiar principles we view [the] evidence and all reasonable inferences in the light most favorable to the prevailing party below. Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it.' " *Pommerenke v. Pommerenke*, 7 Va. App. 241, 244, 372 S.E.2d 630, 631 (1988) (citation omitted). It is well established that the credibility of witnesses and the weight accorded to their testimony are matters solely within the purview of the trial court, and its findings will be reversed on appeal only if "plainly wrong or without evidence to support them." *Wyatt v. Department of Social Servs.*, 11 Va. App. 225, 230, 397 S.E.2d 412, 415 (1990).

### PATERNITY

Infant was born to Carolyn M. Rogers on October 10, 1986. On January 5, 1989, she filed a support petition with the Juvenile and Domestic Relations District Court, which named Brooks as the putative party and "request[ed] that paternity be established . . . and the amount of support determined." The district court ordered the parties to submit to DNA and HLA blood testing and, following a subsequent *ore tenus* hearing, concluded that Brooks was infant's "natural father." Brooks appealed this decision to the circuit court for a trial *de novo*.

At the inception of the circuit court proceedings, Brooks moved to exclude any "probability of paternity" evidence which was based upon the blood testing. While he did not dispute the "reliability" of this evidence, Brooks argued that it was dependent upon "neutral assumptions," without consideration of significant "social evidence" peculiar to this case and indispensable to an accurate interpretation of the tests. Attendant to this motion, the parties conducted extended pretrial examination of Dr. Uwe Heina, an expert in the field of genetic blood testing offered by Rogers, after which Brooks withdrew his objection to the evidence.

During this pretrial hearing, Dr. Heina explained that the testing methodology was designed to be "completely objective." Both the DNA and HLA tests

> look at the mother and child to see what they share and then what is left over had to come from the biological father of the child, in which case you look at what the alleged father has; and if he matches, then you have to refer to a data base to see how rare that genetic type is to give you some indication of how often it will match randomly.[1]

Guided by this protocol, Heina concluded that the probability of Brooks's paternity, "versus a random man of the Caucasian population not [a close] relative," was 99.98% under the DNA test and 99.08% under the HLA test.

Heina noted, however, that if the evidence established that Brooks's son had "equal access[,] as far as intercourse the same number of times," to Rogers as Brooks, the "maximum" probability of Brooks's paternity would diminish to 88.88% on the DNA test and the HLA test would be uninformative. He also confirmed that if Brooks was sterile or did not have access to Rogers within the "window of conception," the probability of his paternity would be zero. Heina further recognized that "[a]ny factor that the Court deem[ed] pertinent," including the credibility of witnesses, would also be relevant to the probability of paternity

---

[1] According to Dr. Heina, the basic "formula for calculating the probability of paternity" is:

$$\frac{Paternity\ index \times Prior\ [probability]}{(Paternity\ index \times Prior\ [probability]) + (1 - Prior\ [probability])}$$

analysis. Thus, the "neutral values" of the formula would yield to the particular circumstances of each case, thereby ensuring a more accurate interpretation of the tests.

During trial, Rogers testified that she first met Brooks at a "Christmas party . . . in December of 1985." She claimed two subsequent sexual liaisons with him, the first at his home on January 31, 1986, and, again, "about two weeks after that." When Rogers became aware of her pregnancy, she "knew [Brooks] was the father" because she did not have "relations with anyone else" during the probable time of conception.

Brooks denied "intimate contact of any kind with [Rogers]." Moreover, he testified that he had undergone a vasectomy in Puerto Rico during 1984. When he was unable to relocate that physician "six to eight weeks" following the procedure, Brooks had obtained a "review" of his post-operative condition from Dr. Tobacci, located on a nearby island. In a related report, dated May 5, 1984, Dr. Tobacci indicated that the "incisions look good . . . seminal fluid collected, no live sperm noted, vasectomy complete." Brooks also produced medical records which suggested that infant was conceived between January 10 and 17, 1986, prior to the alleged trysts with Rogers.

On rebuttal, Dr. Heina testified that even "being absolutely certain that the vasectomy occurred" and "[a]ssuming a failure rate of one in a thousand," the genetic evidence was "so high" in this instance that it, nevertheless, indicated a 99.75% probability that Brooks fathered infant.

In determining paternity, the court is guided by Code §§ 20-49.1 and -49.4. Code § 20-49.4 provides, in pertinent part:

The standard of proof in any action to establish parentage shall be by clear and convincing evidence. All relevant evidence on the issue of paternity shall be admissible. Such evidence may include, but shall not be limited to, the following: (1) Evidence of . . . sexual intercourse between the known parent and the alleged parent at the probable time of conception; (2) Medical . . . evidence relating to the alleged parentage of the child based on tests performed by experts . . . ; (3) The results of scientifically reliable genetic tests, including blood tests, if available, weighted with all the

evidence . . . .

Here, the court clearly considered all of the relevant evidence, expressly including the statutory "factors," in concluding that Brooks was the biological father of infant. Dr. Heina related the probability of Brooks's parentage derived from objective blood analyses. He acknowledged that the particular circumstances of each case were relevant to interpretation of the tests and testified to the probabilities based upon the evidence in this instance. Heina's testimony was proper, and it remained for the fact finder to weigh and consider it with the other evidence. Code § 20-49.4. *See* Code § 8.01-401.1; *Buckland v. Commonwealth*, 229 Va. 290, 296, 329 S.E.2d 803, 806-07 (1985).

The record discloses that the trial judge "simply [did not] believe that there was a vasectomy," there is no evidence of sexual activity between Rogers and Brooks's son during the relevant period, and the "window of conception" for infant was never established conclusively. The genetic evidence, however, was totally consistent with Rogers's testimony and offered compelling proof of paternity. Under such circumstances, the record provided ample support for the trial court's finding, by clear and convincing evidence that Brooks was the father of the child, and that decision will not be disturbed on appeal.

## CHILD SUPPORT

At the subsequent hearing related to support of infant, Brooks testified that he had been employed by NationsBank and its corporate predecessor for thirteen years before being terminated, without fault, on February 29, 1992. At the time of discharge, Brooks was a senior vice-president, earning approximately $5367 per month. Brooks was then also the "100 percent owner" of B&D Electric Supply, Inc., a business which he began in 1978, and "figured [he] could just go to B&D and live peacefully." At the time of the hearing, he was employed at B&D "100 percent of the time."

For the years 1989 and 1990, Brooks received an annual salary from B&D of $72,000 and $71,000, respectively. However, due to an "extensive corporate defect [sic]," Brooks testified that he had

"not drawn a salary . . . since April 30, 1991."[2] A "Profit Analysis" for B&D reflected operating losses of $97,605, actual, and $85,138, annualized, for the years 1991 and 1992, respectively. At the time of the hearing, Brooks's gross income included only dividends and a military retirement, and his evidence indicated a "negative cash flow" each month. Brooks acknowledged that he would soon receive approximately $250,000 from a "thrift plan" and "pension" from NationsBank, which he intended to "roll . . . into a defined benefit plan."

Based upon this and other relevant evidence, the trial court calculated the presumptive amount of child support pursuant to Code § 20-108.2 and then "impute[d] income [from] B&D Electric . . . of $5300.00" per month to Brooks. The court noted that it "could have imputed the additional income . . . from [Brooks's] Thrift Plan and pension as well as higher yields from his [investment] accounts, but chose not to do so because of the imputed income from B&D Electric." This imputation of income significantly increased Brooks's support obligation above the guideline amount.

In determining child support, there is a rebuttable presumption that the amount determined in accordance with the statutory guidelines, Code § 20-108.2, is the correct award. Code §§ 20-108.1(B) and -108.2(A). However, once the presumptive amount is ascertained, the trial court may, after consideration of "relevant evidence pertaining to . . . factors" specified in Code § 20-108.1, conclude that "application of such guidelines would be unjust or inappropriate in a particular case." Code § 20-108.1(B); *Richardson v. Richardson*, 12 Va. App. 18, 21, 401 S.E.2d 894, 896 (1991). The court may then adjust the amount based on such factors, provided the departure is supported by "written findings in the order . . . that the application of [the] guidelines would be unjust or inappropriate." Code § 20-108.1(B); *O'Brien v. Rose*, 14 Va. App. 960, 964, 420 S.E.2d 246, 248-49 (1992). The order "must identify the factors that justified deviation . . . and explain why and to what extent the factors justified the adjustment" in "enough detail and exactness to allow for effective appellate review of the findings." *Richardson*, 12 Va. App. at 22, 401 S.E.2d at 897.

---

[2] Brooks collected a total salary of $21,667 for 1991.

■ Child support addresses the "welfare and best interests of the child, not the convenience or personal preference of a parent." *Hur v. Department of Social Servs.*, 13 Va: App. 54, 60, 409 S.E.2d 454, 458 (1991). A parent may not "purposefully choose to pursue a low paying career which operates to the detriment of . . . [the parent's] children." *Payne v. Payne*, 5 Va. App. 359, 364, 363 S.E.2d 428, 431 (1987). Thus, "[i]mputed income to a party who is voluntarily unemployed or voluntarily under employed" is among the several statutory factors "affecting the obligation [and] the ability of each [parent] to provide child support" which may justify deviation from the presumptive amount. Code § 20-108.1(B); *Farley v. Liskey*, 12 Va. App. 1, 5, 401 S.E.2d 897, 899 (1991). To properly assess this factor, the trial court must consider the "[e]arning capacity . . . and financial resources," "[e]ducation and training . . . and the ability and opportunity . . . to secure such education and training" of the parents, as well as "[s]uch other factors . . . as are necessary to . . . the equities for the parents and children." Code § 20-108.1(B); *Cochran v. Cochran*, 14 Va. App. 827, 830, 419 S.E.2d 419, 421 (1992). If the court determines from the evidence that imputation of income to a parent is justified, the award is "calculated by adding . . . a just and appropriate amount [to] the amount reflected in Code § 20-108.2," accompanied by the requisite written findings. *Richardson*, 12 Va. App. at 19-20, 401 S.E.2d at 895.

■ When imputed income and the resulting child support are "supported by the evidence and the trial judge has not otherwise abused his or her discretion, the deviation . . . will be upheld on appeal." *Id.* at 21, 401 S.E.2d at 896; *see also Kaufman v. Kaufman*, 7 Va. App. 488, 494, 375 S.E.2d 374, 377 (1988). However, support must be based upon "circumstances in existence at the time of the award" and not upon speculation or conjecture. *Payne*, 5 Va. App. at 363, 363 S.E.2d at 430. Both the determination to impute income and the related amount must result from application of the statutory factors to the evidence before the court. *See, e.g., Brody v. Brody*, 16 Va. App. 647, 651, 432 S.E.2d 20, 22 (1993) (parent recently resigned employment with established earnings); *Barnhill v. Brooks*, 15 Va. App. 696, 701, 427 S.E.2d 209-10, 213 (1993) (parent voluntarily changed employment with reduced income); *Cochran*, 14 Va. App. at 830-31, 419 S.E.2d at 421 (parent declined employment with history of "substantial" earnings); *Hur*, 13 Va. App. at 60-61, 409 S.E.2d at 458-59 (par-

ent unemployed despite available earning potential).

Here, the trial court justified a departure from the presumptive child support amount by imputing income to Brooks from B&D. However, there was insufficient evidence in the record to support the trial court's implicit and necessary finding that Brooks was either voluntarily unemployed or underemployed, which resulted in a diminution of income. No evidence was presented that recent earnings of B&D were adequate to sustain the imputed salary, that the financial reversals of B&D were attributable to any neglect or other acts of Brooks, that he had misrepresented its assets or performance, that he had ignored other available and suitable employment opportunities, with attendant earnings, or that he had otherwise engaged in conduct to his economic disadvantage. The trial court, therefore, imputed income to Brooks without sufficient evidence to support that factor in justification of guideline departure.

Accordingly, we affirm the determination that Brooks was the natural father of infant but reverse the related child support award and remand the cause for a redetermination of Brooks's support obligation.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

Baker, J., and Barrow, J., concurred.