COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Moon, Judges Coleman and Fitzpatrick
Argued By Teleconference


COMMONWEALTH OF VIRGINIA,
 DEPARTMENT OF SOCIAL SERVICES,
 DIVISION OF CHILD SUPPORT ENFORCEMENT,
 ex rel. COMPTROLLER OF VIRGINIA,
 o/b/o DEBRA OVERBY                              OPINION BY
                                        JUDGE SAM W. COLEMAN III
v.        Record No. 2528-94-3              APRIL 16, 1996

JAMES FLANEARY


                FROM THE CIRCUIT COURT OF HENRY COUNTY
                      David V. Williams, Judge

            Alice G. Burlinson, Special Counsel (Betsy S.
            Elliott, Senior Special Counsel, Division of
            Child Support Enforcement; James S. Gilmore,
            III, Attorney General; William H. Hurd,
            Deputy Attorney General; Siran S. Faulders,
            Senior Assistant Attorney General; Robert B.
            Cousins, Jr., Senior Assistant Attorney
            General, on briefs), for appellant.

            Douglas K. Frith (Douglas K. Frith & Associates,
            on brief), for appellee.


     The Department of Social Services, Division of Child Support

Enforcement (DCSE), appeals the trial court's order finding that

the evidence failed to prove that James Flaneary is the father of

Gerald Lee Overby and dismissing DCSE's petition for child

support.  DCSE contends that Code § 20-49.1(B) requires that when

DNA test results show a probability of paternity of 98% or

greater, the trial court must treat the results as the equivalent

of a judgment finding paternity and, therefore, the trial court

erred by finding nonpaternity despite DNA test results showing a

  99.92% probability of paternity.

We hold that Code § 20-49.1(B) applies only when the parties have signed a voluntary acknowledgement of paternity under oath, or after having signed such an acknowledgement have obtained a "subsequent" genetic test that affirms at least a 98% probability of paternity. Because the parties had not executed an acknowledgement of paternity, Code § 20-49.1(B) does not apply. Therefore, Code § 20-49.4 is the applicable statute by which we review the trial court's decision that DCSE failed to prove by clear and convincing evidence that Flaneary is the biological father of Gerald Lee Overby.

Upon our review, and applying the provisions of Code § 20-49.4, we hold that the unimpeached DNA test results showing a 99.92% probability of paternity and the uncontroverted evidence that Debra Overby and Flaneary had sexual intercourse during the period of conception proved paternity, as a matter of law, by clear and convincing evidence. Thus, because the trial court's finding that Flaneary is not Gerald Lee Overby's father is plainly wrong, we reverse the trial court's decision and remand the matter for the court to enter an appropriate order of paternity and to determine child support.

## I. **FACTS**

On March 17, 1987, Debra Overby gave birth to a son, Gerald Lee Overby. Because Debra Overby received public assistance for her son's support, she assigned the right to child support from the father to DCSE. In 1992, DCSE required Debra Overby to

identify the child's father and she named Willard Edward Stump as the biological father. Stump voluntarily agreed to paternity testing, and the test results positively excluded him as the child's father.

After Stump was excluded, DCSE again requested that Debra Overby identify the father. This time, she identified James Flaneary, the appellee, as the father. DCSE filed a petition against Flaneary to establish paternity and to assess and order the payment of child support. The court ordered that DNA blood tests be conducted on Debra Overby, Gerald Lee Overby, Flaneary, and Flaneary's brother.

The DNA test results excluded Flaneary's brother as the father. In testing Flaneary, the laboratory probed six genetic systems from the child and parents for comparison. Five of the six systems probed from Flaneary matched those of Gerald Lee Overby and, according to the laboratory's calculations, these phenotype comparisons established a probability of paternity for Flaneary of 99.92%. According to the lab's report, the calculations were based upon accepted guidelines established by the American Association of Blood Banks. A second mismatch between the child's and Flaneary's phenotypes would have excluded Flaneary as the father. However, each phenotype of the child's that matched Flaneary's significantly increased the statistical probability that he is the child's father.

At the evidentiary hearing, Debra Overby acknowledged that

she had previously signed an affidavit naming Willard Stump as the child's father and that she told a representative of DCSE that Flaneary was not Gerald's father. Overby testified that she had first named Stump as the father because he and Flaneary were the only two men she had sexual relations with during the period of conception and Flaneary had told her that he could not father a child. She testified that she first had sexual intercourse with Flaneary on July 6, 1986.

Dr. Daniel B. Demers, an expert in DNA testing, gave two possible explanations why the failure of one of Gerald Overby's genetic systems to match that of Flaneary did not exclude paternity: "(1) The rare likelihood that James Flaneary had the same genetic material as an unknown man in the population or (2) Mr. Flaneary was the biological father but a rare mutational even[t] occurred during spermatogenesis." Demers testified that, in his opinion, the second explanation was the most likely of the two.

Demers further explained that Stump and Flaneary's brother were only probed three times, while Flaneary was probed six times, because Stump and the brother did not match Gerald after three probes and, thus, were excluded. He explained that the percentage of probability of paternity increases each time the blood is probed and a match is found between the child's and putative father's genetic systems or genetic markers. On cross-examination, Demers explained that because five phenotypes

matched, it was highly probable, but not definite, that Flaneary was the child's father, and that had there been a second inconsistent probe, Flaneary would have been excluded as the father.

Flaneary testified that Overby told him that she was already pregnant when they first had sexual intercourse. He also denied that he was the father and denied that he told anyone that he was the father. Furthermore, in light of Overby's testimony that she first had sexual intercourse with Flaneary on July 6, 1986, he introduced medical records from Overby's obstetrician which indicated that her pregnancy could have begun in early June 1986.

In holding that Overby and DCSE had failed to carry the burden of proving paternity, the trial court found that Overby's testimony was "equivocal [and] confused," that Flaneary denied paternity, and that the DNA testing "ha[d] at least one joker." Accordingly, the trial court ruled that Flaneary was not Gerald Lee Overby's father and dismissed DCSE's petition.

## II. **ANALYSIS**

DCSE, citing Code § 20-49.1(B), contends that when DNA testing affirms at least a 98% probability of paternity, the test results are conclusive as to paternity and the trial court need not consider other evidence of paternity. Code § 20-49.1(B) provides that

> [t]he parent and child relationship between a child and a man may be established by a written statement of the father and mother made under oath acknowledging paternity or subsequent scientifically reliable genetic

- 5 -

tests, including blood tests, which affirm at least a ninety-eight percent probability of paternity. Such statement or blood test result shall have the same legal effect as a judgment entered pursuant to § 20-49.8. In the absence of such acknowledgment or if the probability of paternity is less than ninety-eight percent, such relationship may be established as otherwise provided in this chapter.

Thus, DCSE argues that either a sworn acknowledgement of paternity or a genetic test result showing the requisite probability of paternity has the same legal effect as a judgment of paternity.

Flaneary asserts that Code § 20-49.4, not Code § 20-49.1, controls contested paternity proceedings. Code § 20-49.4 provides, "in any action to establish parentage, . . . [a]ll relevant evidence on the issue of paternity shall be admissible . . . [and] may include, but shall not be limited to . . . [t]he results of scientifically reliable genetic tests, including blood tests, if available, weighted with all the evidence." (Emphasis added). Moreover, Flaneary points out that under Code § 20-49.4, paternity must be proven by clear and convincing evidence. He notes that Code § 20-49.4 sets forth a nonexclusive list of the types of evidence, including scientifically reliable genetic tests, that are relevant to prove paternity.[1] He argues,

_____

[1] Code § 20-49.4 provides:

The standard of proof in any action to establish parentage shall be by clear and convincing evidence. All relevant evidence on the issue of paternity shall be admissible. Such evidence may include, but

- 6 -

therefore, that Code § 20-49.1 applies only when a sworn

voluntary acknowledgement of paternity exists and that Code

§ 20-49.4 applies in contested judicial proceedings to establish

paternity where, as in this case, no voluntary acknowledgement

exists, or where the genetic testing reports less than a 98%

probability of paternity.

The initial question presented by DCSE is whether Code

§ 20-49.1 applies and requires a trial court in a contested

(..continued)

> shall not be limited to, the following:
>
> 1.  Evidence of open cohabitation or sexual intercourse between the known parent and the alleged parent at the probable time of conception;
> 2.  Medical or anthropological evidence relating to the alleged parentage of the child based on tests performed by experts. If a person has been identified by the mother as the putative father of the child, the court may, and upon request of a party shall, require the child, the known parent, and the alleged parent to submit to appropriate tests;
> 3.  The results of scientifically reliable genetic tests, including blood tests, if available, weighted with all the evidence;
> 4.  Evidence of the alleged parent consenting to or acknowledging, by a general course of conduct, the common use of such parent's surname by the child;
> 5.  Evidence of the alleged parent claiming the child as his child on any statement, tax return or other document filed by him with any state, local or federal government or any agency thereof;
> 6.  A true copy of an acknowledgement pursuant to § 20-49.5; and
> 7.  An admission by a male between the ages of fourteen and eighteen pursuant to § 20-49.6.

paternity proceeding to give genetic test results affirming at least a 98% probability of paternity the same legal effect as a judgment.[2]  Clearly, the major purpose for enacting Code § 20-49.1 was to eliminate the necessity of obtaining a judicial adjudication of paternity in cases where both parents voluntarily acknowledge under oath a child's paternity.  See 1990 General Assembly, Summary of Legislative Proposal Priority 1, Department of Social Services, Legislative Draft File, House Bill 961 (1990); see also Code § 63.1-250.2.

In Dunbar v. Hogan, 16 Va. App. 653, 658-59, 432 S.E.2d 16, 19 (1993), we held, however, that under Code § 20-49.1, a voluntary acknowledgement of paternity under oath does not preclude a party from litigating paternity even though the statute provides that such acknowledgement shall be accorded the effect of a "judgment entered pursuant to § 20-49.8."[3]  We held

_____

[2] Code §§ 20-49.1 and -49.4 were first enacted in 1988, see 1988 Va. Acts. c. 866, and then amended in 1990, see 1990 Va. Acts c. 836.  They replaced former Code § 20-61.1, which, like Code § 20-49.4, set forth several types of evidence, including blood tests, that could be introduced in an action to establish paternity.  Code § 20-61.1 (repealed 1988).

[3] Code § 20-49.8(B) provides:

> A determination of paternity made by any other state shall be given full faith and credit, whether established through voluntary acknowledgment or through administrative or judicial process; provided, however, that, except as may otherwise be required by law, such full faith and credit shall be given only for the purposes of establishing a duty to make payments of support and other payments contemplated by subsection A.

that such acknowledgements are accorded treatment as a judgment for such purposes as administrative support orders, Code § 63.1-250.1, or full faith and credit to foreign support orders and other payments.  See Code § 20-49.8(B).  Thus, even if Code § 20-49.1 applied to cases where the parties had not voluntarily acknowledged paternity but where genetic test results affirm at least a 98% probability of paternity, the Dunbar rationale would not preclude the putative father from contesting and litigating the issue of paternity.  When litigating the issue of paternity, the question then is whether Code § 20-49.1 applies and requires that DNA test results that affirm at least a 98% probability of paternity be accorded either a rebuttable or conclusive presumption of paternity.

> It is a well established rule of construction that a statute ought to be interpreted in such a manner that it may have effect, and not found to be vain and elusive. . . . It is our duty to give effect to the wording of the statute, and allow the legislative intention to be followed.

Barnett v. D.L. Bromwell, Inc., 6 Va. App. 30, 34, 366 S.E.2d 271, 273 (1988) (en banc) (quoting McFadden v. McNalton, 193 Va. 455, 461, 69 S.E.2d 445, 449 (1952)).  In Dunbar, we decided only that under Code § 20-49.1 an acknowledgement of paternity under oath is not res judicata or collateral estoppel to a judicial adjudication of paternity; we did not consider the extent to which or whether Code § 20-49.1 controls or has any effect in a judicial proceeding to determine paternity.  We hold that Code

§ 20-49.1, by its terms, applies only where the parties have voluntarily acknowledged paternity under oath, or where after acknowledging paternity under oath a "subsequent scientifically reliable genetic test[] . . . affirm[s] at least a ninety-eight percent probability of paternity."  (Emphasis added).

The purpose of Code § 20-49.1, as we pointed out in Dunbar, was to deal with paternity claims that the parties voluntarily agreed upon, including those that "subsequently" were verified by genetic testing that affirmed a high probability of paternity. Code § 20-49.1 provides that those situations shall be treated as judgments for certain purposes, such as collection and enforcement of support through administrative orders or full faith and credit, even though there has been no formal adjudication of paternity.  See Code § 20-49.8(B).  The legislative history and statutory scheme make clear that Code § 20-49.4 controls contested paternity disputes and Code § 20-49.1 does not apply.

Many states have enacted paternity statutes establishing a rebuttable presumption of paternity where genetic test results report a paternity equal to or greater than a designated percentage.  See, e.g., Howie v. Thomas, 514 N.W.2d 822, 824 (Minn. Ct. App. 1994) (statute provides that when a blood test from accredited laboratory shows a paternity probability of 99% or greater, the burden shifts to the alleged father to prove nonpaternity by clear and convincing evidence); Filkins v. Cales,

619 N.E.2d 1156, 1158 (Ohio Ct. App. 1993) (statute provides that genetic test results indicating a probability of 95% or greater raises presumption of paternity and satisfies preponderance of evidence burden of proof, thereby requiring presumed father to rebut by clear and convincing evidence); Gregory v. McLemore, 899 P.2d 1189 (Okla. Ct. App. 1995) (statute creates rebuttable presumption of paternity where scientifically reliable genetic tests show statistical probability of paternity at 95% or more); In re the paternity of J.M.K., 465 N.W.2d 833, 835 (Wis. Ct. App. 1991) (statute creates a rebuttable presumption of paternity where an alleged father is shown to have a statistical probability of paternity of 99% or higher), review denied, 471 N.W.2d 510 (Wis. 1991).

Code § 20-49.1 neither expressly establishes a rebuttable presumption of paternity nor otherwise addresses the "host of technical, legal questions" presented by such a presumption. D. H. Kaye, Presumptions, Probability and Paternity, 30 Jurimetrics 323, 327 (1989-90). Therefore, we decline to establish such a presumption under the guise of statutory construction. See Barnett, 6 Va. App. at 34, 366 S.E.2d at 273. Rather, we hold that the Virginia General Assembly intended that "subsequent" genetic test results showing a probability of paternity of 98% or higher are to be given greater weight only when accompanied by a prior voluntary acknowledgement of paternity under oath.

By contrast, Code § 20-49.4 contains no rebuttable presumption of paternity. To the contrary, it expressly provides that the genetic test results shall be considered together with the other evidence of paternity and given such weight as the fact finder determines is justified. Where there is no voluntary acknowledgement of paternity under oath, or where there is an acknowledgement but a party in interest challenges paternity and the genetic test results show a probability of paternity of less than 98%, paternity shall be established in accordance with the provisions of Code § 20-49.4. Because there was no acknowledgement of paternity here, the decision of the trial court will be affirmed unless, as a matter of law, clear and convincing evidence proves paternity.

Code § 20-49.4 provides that "[t]he standard of proof in <u>any</u> action to establish parentage shall be by clear and convincing evidence. All relevant evidence on the issue of paternity shall be admissible." (Emphasis added). Among the nonexclusive list of factors that may be considered to prove paternity under Code § 20-49.4 are

> 1. Evidence of open cohabitation or sexual intercourse between the known parent and the alleged parent at the probable time of conception; [and]
>
> \*    \*    \*    \*    \*    \*    \*
>
> 3. The results of scientifically reliable genetic tests, including blood tests, if available, weighted with all the evidence.

<u>Id.</u>

- 12 -

Clear and convincing evidence is
> [t]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal.

Martin v. Pittsylvania County Dep't of Social Servs., 3 Va. App. 15, 21, 348 S.E.2d 13, 16 (1986) (quoting Gifford v. Dennis, 230 Va. 193, 198 n.1, 335 S.E.2d 371, 373 n.1 (1985)).

On appeal, the reviewing court cannot set aside the judgment of the trial court sitting without a jury unless it is "plainly wrong or without evidence to support it."  Code § 8.01-680; see Hankerson v. Moody, 229 Va. 270, 274, 329 S.E.2d 791, 794 (1985).
> However, a trial court's conclusion based on evidence that is "not in material conflict" does not have this binding effect on appeal.  The trier of fact must determine the weight of the testimony and the credibility of the witnesses, but it "may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record."

Hankerson, 229 Va. at 274, 329 S.E.2d at 794 (citations omitted).  In order to reverse the trial court, we must find "as a matter of law that [DCSE] sustained [its] burden of proving" paternity by clear and convincing evidence.  Tomko v. Michael's Plastering Co., 210 Va. 697, 700, 173 S.E.2d 833, 836 (1970).

Here, Dr. Demers provided uncontroverted testimony that the genetic blood test results reported a 99.92% probability of

paternity and that the test was conducted in accordance with the accepted standards of the American Association of Blood Banks. There was no evidence challenging the test results or the reliability of the test procedure or methodology.  Although the trial judge commented that the DNA test had at least one "joker in there," apparently suggesting that the test was not reliable or the result was not accurate, Dr. Demers testified that the most likely explanation for this phenomenon was that a rare mutational event occurred during spermatogenesis and that the 99.92% calculation took this discrepancy into account.[4] Therefore, the uncontroverted evidence established that the genetic tests used here were scientifically reliable and that the 99.92% calculation was a correct statistical probability of paternity.

We are bound by the trial court's finding that Debra Overby's testimony was "equivocal [and] confused," and must discard any of her testimony that conflicts with Flaneary's testimony or with other evidence in the record.  See Brooks v. Rogers, 18 Va. App. 585, 587, 445 S.E.2d 725, 726 (1994) (stating

---

[4] Dr. Demers' report stated "the mutation rate was included to estimate the chance of paternity given the phenotypes of the individuals tested.  This type of analysis includes all of the genetic evidence and results in a downward adjustment of the cumulative paternity index and probability of paternity."
The statistical probability calculation also takes into consideration the fact that the testing methodology, as with other scientific testing, yields an occasional false positive or false negative.  See D. H. Kaye, Presumptions, Probability and Paternity, 30 Jurimetrics 323, 333-36 (1989-90).

that "the credibility of witnesses and the weight accorded the their testimony are matters solely within the purview of the trial court"). Nevertheless, Flaneary confirmed that he had sexual intercourse with Overby on July 6, 1986, and although he testified that she told him that she was already pregnant, this statement, standing alone, is not sufficient to establish with reliability the period of conception or that Overby was, in fact, pregnant. Furthermore, the medical records Flaneary produced do not prove that Overby was pregnant when she had intercourse with him for the first time. For instance, an entry dated January 28, 1987, states that the gestational age was "33 weeks (+ - 3 wks)," which would include July 6, 1986. Therefore, even without Overby's testimony, the evidence that Flaneary had access during the period of conception is uncontroverted.

Because uncontroverted evidence established that genetic blood tests reported a 99.92% probability of paternity and that Flaneary had access during the period of conception, we hold that the evidence proved clearly and convincingly, as a matter of law, that Flaneary is the father of Gerald Lee Overby. See Buckland v. Commonwealth, 229 Va. 290, 297, 329 S.E.2d 803, 807 (1985) (holding that blood tests reporting a 99.72% probability of paternity "alone proved Buckland's paternity beyond a reasonable doubt"). Accordingly, we remand the matter to the trial court for entry of an order to that effect and to determine the amount of Flaneary's child support obligation.

<u>Reversed and remanded</u>.