COURT OF APPEALS OF VIRGINIA


Present:  Judges Russell, AtLee and Malveaux


TYEISHA ANTOINETTE THRASHER

                                                    MEMORANDUM OPINION* BY
v.      Record No. 1323-17-1                  JUDGE MARY BENNETT MALVEAUX
                                                    AUGUST 14, 2018
NEWPORT NEWS DEPARTMENT OF
 HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

(Joshua A. Goff; Goff Voltin, PLLC, on brief), for appellant.
Appellant submitting on brief.

(Shannon M. Manning, Senior Assistant City Attorney; Gary S.
Nachman, Guardian *ad litem* for the minor children; Sarfan &
Nachman, LLC, on brief), for appellee.  Appellee and Guardian *ad
litem* submitting on brief.


The Newport News Circuit Court ("circuit court") entered orders terminating the residual

parental rights of Tyeisha Antoinette Thrasher ("mother") to two of her children, pursuant to Code

§ 16.1-283(C)(2).  She appeals those orders, arguing that the circuit court erred in denying her

motion to strike and terminating her rights because the Newport News Department of Human

Services ("DHS") failed to prove, by clear and convincing evidence, that the termination criteria set

forth in Code § 16.1-283(C) had been satisfied.  For the reasons that follow, we affirm the circuit

court.

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

We review the evidence in the light most favorable to DHS, the party that prevailed below, affording it all inferences that are fairly deducible from this evidence. See Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 40, 764 S.E.2d 284, 287 (2014).

Events Prior to Termination Proceedings

Mother and Carl Allen ("father") married in 2015 and had twin girls, C.A. and C.J., in November of that year. In February 2016, C.J. was admitted to the hospital for failure to thrive. While there, she received a chest x-ray that indicated rib fractures. Further tests revealed that C.J. suffered from a "pull and bend" fracture of her left leg, as well as old and new subdural hematomas. A physician indicated that these injuries were non-accidental, and on March 10, 2016, DHS received a referral alleging that C.J. had been abused.

The following day, DHS interviewed mother and father. Neither parent could explain C.J.'s injuries, and both denied causing them. Mother insisted that she was her children's primary caretaker and responsible for all of their care.

On March 15, 2016, C.A. visited the hospital for a complete body scan. That scan revealed healing humerus and rib fractures. The physician who conducted the scan reported that C.A.'s injuries were indicative of child abuse. DHS took the twins into custody and filed emergency removal petitions on their behalf. Those petitions stated that C.J. and C.A. had "multiple serious injuries that have been noted by the physicians . . . to be non-accidental. The parents cannot provide an explanation for these injuries." On March 16, the Newport News Juvenile and Domestic Relations District Court ("J&DR court") entered emergency removal orders for C.J. and C.A.

Following a May 10, 2016 hearing, the J&DR court entered adjudicatory orders finding that C.J. and C.A. were abused or neglected as defined in Code § 16.1-228(1). The J&DR court

also entered dispositional orders which transferred custody of the children to DHS and approved initial foster care service plans with the goals of returning C.J. and C.A. to their home, with a concurrent goal of relative placement. The plans called for the parents to maintain stable employment and housing, complete parental capacity evaluations, participate in individual and family therapy, and take parenting classes. Father was also required to undergo a psychiatric evaluation, seek substance abuse treatment and medication management, and avoid criminal activity that would jeopardize his probation.

Dr. Jennifer Gildea, a licensed clinical psychologist, performed psychological and parenting capacity evaluations of mother and father on June 14, 2016. During mother's evaluation, mother revealed that she "felt [that] another family member [had] injured [the children]." Dr. Gildea recommended that mother receive parenting education to "improve her awareness of developmentally appropriate disciplinary techniques and non-corporal discipline techniques." She also recommended that both parents receive marital and family therapy and parenting coaching during any supervised contact with C.J. and C.A. Dr. Gildea specifically noted that if either parent "cannot be ruled out as an abuser, [their] contact with the children should remain supervised." At the conclusion of her evaluations, Dr. Gildea also stated that "[i]deally, it is recommended that polygraph testing of both parents be conducted in order to help gain further clarity about events leading up to the children's injuries, so that more pointed safety planning and placement decisions may be made for this family." Mother's evaluation concluded that she had "demonstrated a consistent pattern of failing to maintain stability and function with the addition of life stressors." Further, "[t]he ongoing risks of her inability to protect her children are considered very high, while her prognosis for sustained stability over an extended period of time is considered very low." DHS provided copies of Dr. Gildea's evaluations to mother and father and reviewed her recommendations with them.

An initial foster care review hearing occurred on August 5, 2016. Following the hearing, the J&DR court entered orders continuing the goals of returning the children to their home, concurrent with relative placement. However, relative placement efforts were unsuccessful and mother and father were unable to provide the names of additional placement candidates.

During the summer and fall of 2016, mother, who was serving in the United States Navy, received and completed parenting classes through the military. Father received and completed individual therapy through the military, and both mother and father received structural family therapy through DHS. Neither parent participated in the polygraph testing recommended by Dr. Gildea. Father did not complete his psychiatric evaluation, assessment for medication management, drug treatment, or regular drug screenings. He was not forthcoming with DHS about his drug use and criminal activities, and was only intermittently employed. DHS did not offer parenting coaching to mother and father during this time, because parenting coaching was an in-home service and matters had not progressed sufficiently for C.J. and C.A. to return home. DHS conducted a number of supervised visitations, during which mother was the main caretaker for the children. DHS asked mother and father whether C.J. and C.A. were ever alone with other individuals during the period when their injuries occurred. The parents indicated they were their children's main caretakers, and father never admitted to third parties being with the children.

DHS also provided structural family therapy to mother and father. During this therapy, mother did not deny that C.A. and C.J. had suffered abuse or mistreatment. She also stated she did not believe she was responsible for it. Father never admitted any responsibility for the abuse. The foster care social worker assigned to C.A. and C.J. also discussed the children's injuries with mother and father, and they were unable to offer her a reasonable explanation of their daughters' injuries. Neither parent indicated that the other parent was responsible for the injuries, and although they said that when they visited relatives in Maryland they "felt like something had

- 4 -

happened . . . , they weren't sure." Neither mother nor father ever provided DHS with information about the possible source or sources of the injuries which DHS could investigate.

Termination Proceedings and Subsequent Events

On December 2, 2016, DHS filed petitions for permanency planning hearings and new foster care service plans for C.A. and C.J. Those documents reflected new goals of adoption for the twins, and noted that while mother had made "some progress," she also "ha[d] been challenged with engaging in her services." Further, during visitations, she would frequently "daydream and have a flat affect." In recommending that the goals for C.J. and C.A. be changed to adoption, DHS noted "several contributing factors to include parents' lack of sufficient progress with their service plan responsibilities, housing and employment stability, and viable relative placement options." In particular, DHS stated its "great concern for the children's safety and well-being due to the parents' . . . lack of honesty regarding the abuse the children experienced" prior to their removal. Mother had denied she was responsible for the injuries to her children and told Dr. Gildea she felt that another family member was the abuser, but "has kept that person a secret" and "not held that family member responsible." DHS concluded that "[d]ue to this, [mother] has not shown the agency that she can prevent and protect her children from bodily harm," and there remained "a great concern on [*sic*] whether or not [mother] will be able to protect her children from neglect and abuse in the near future." On December 6, 2016, DHS filed petitions to terminate mother's residual parental rights to C.J. and C.A.

Also in December, mother left the Navy at the conclusion of her enlistment. Rasheena Harris, a family engagement worker with DHS, noted that around that time, mother began experiencing difficulty maintaining stable housing, employment, and transportation. Father told Harris "there [were] some disputes between himself and [mother] which caused the housing folks to force them to leave" their apartment, and mother and father began living with relatives in

Norfolk. Mother had lost her vehicle, and both mother and father began to miss scheduled visitations, or to arrive late or cancel them at the last minute. Mother was expecting another child, and moved to Baltimore for family support. Harris noted that mother's relocation made it difficult to coordinate visitations, and communication with her became "very sporadic." Further, "[a] lot of the ongoing services were difficult to follow-up on or to continue" because mother was in another state. Father's whereabouts were frequently unknown, and Harris often experienced difficulty contacting him. Both parents ceased participating in structured family therapy around January 2017, after mother relocated and the therapist lost contact with mother and father. However, mother began calling the therapist occasionally for "telephone therapy," "just to check in and kind of get some focus."

A permanency planning hearing, initially scheduled for January 3, 2017, was continued numerous times until March 16. Neither mother nor father attended the hearing. On May 30, 2017, the J&DR court entered permanency planning orders approving the new goals of adoption for C.A. and C.J. and orders terminating the residual parental rights of mother and father, pursuant to Code § 16.1-283(C)(1). Mother and father appealed to the circuit court.

The circuit court conducted a hearing on the matter on August 14, 2017. Harris testified that DHS changed the goals for the children to adoption "due to the lack of progress that was being made . . . and the length of stay that the children had been in care." Specifically, DHS was unable to address "why the children came into care because of unexplained non-accidental injuries . . . . We were not able to remedy that. That was the top reason they came into care." Ivy Cherry, the children's foster care social worker, testified that DHS changed its goals for C.A. and C.J. because they felt it was best for the children, given the limited progress being made towards the goals identified for the parents. Specifically, "we weren't able to get towards parenting [coaching]. We needed to get to a point that we could have unsupervised visits."

- 6 -

Linda Meyers, the children's foster parent from the time DHS took them into care, testified that C.J. and C.A. were developing perfectly well and their initial medical problems had been resolved. After their placement with Meyers, C.J. and C.A. received regular physical and occupational therapy and were walking, crawling, running, and climbing stairs. The frequency of the children's "night terrors"—"screaming, not a baby cry but a scream"—had also declined. Meyers' extended family and other children in the household had become very involved with the twins. Meyers stated that she and her husband were interested in adopting the two girls.

Mother moved to strike DHS's evidence, and the circuit court denied the motion. Mother then testified that after she moved to Baltimore in late 2016, she was depressed, "house-hopping," and unemployed. However, in June, 2017, she found regular work in a warehouse. Although she still lacked her own transportation, mother secured an apartment and in August 2017 was living with father and their youngest child, who was born the previous spring. She acknowledged that C.J. and C.A. were removed from her care because they had sustained serious physical injuries. However, mother denied that she or father had caused those injuries, although she agreed that she and father were the children's caretakers and no one else was in a position to harm them. Mother also admitted that since C.J. and C.A. had been removed by DHS, she had attempted to get a protective order against father for domestic violence. Mother expressed willingness to take the polygraph test suggested by Dr. Gildea.

Mother renewed her motion to strike. In ruling from the bench, the circuit court noted that "the problem in this case is the serious bodily injury to both of the children" and the need to address that issue. The court discussed Dr. Gildea's recommendations, including that mother and father take polygraph tests "that would potentially root out who was responsible," so that "the Court . . . could set up guidelines" to prevent such abuse in the future. However, the court noted that more than a year had passed since C.A. and C.J. were taken into care, and "the

problem, be it the parents or somebody that the parents allowed [to have] access to the children," had not been identified so that the children could be "place[d] . . . into circumstances that would . . . eliminate that problem." Based on these circumstances, the circuit court found it was in the best interests of C.J. and C.A. to terminate their parents' residual parental rights. The court granted the termination petitions and approved the new foster care service plans with goals of adoption, and, on September 8, 2017, entered new permanency planning orders and orders terminating mother's residual parental rights, pursuant to Code § 16.1-283(C)(2). This appeal followed.

## II. ANALYSIS

After a child is "placed in foster care as a result of court commitment," a court may terminate a parent's residual parental rights if it makes certain findings. Code § 16.1-283(C). First, the court must find that termination of the parent's rights "is in the best interests of the child." Id. The court must also find either that the parent failed to maintain contact with and to provide or plan for the child's future for six months after the child was placed in foster care, see Code § 16.1-283(C)(1), or that the parent failed to remedy the circumstances that led to or required the continuation of the child's placement into foster care, see Code § 16.1-283(C)(2). Specifically, before parental rights may be terminated under subsection (C)(2), the court must find that the parent, "without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement . . . ." Code § 16.1-283(C)(2). The court also must find that the relevant agencies made "reasonable and appropriate efforts" to help the parent remedy those conditions. Id. All of these findings must be "based upon clear and convincing evidence." Code § 16.1-283(C). Such evidence is "intermediate, being more than a mere preponderance, but not

to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Dep't of Soc. Servs., Div. of Child Support Enf't ex rel. Comptroller v. Flaneary, 22 Va. App. 293, 304, 469 S.E.2d 79, 84 (1996) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 21, 348 S.E.2d 13, 16 (1986)).

We traditionally have "acknowledge[d] that 'termination of . . . parental rights is a grave, drastic and irreversible action.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 400, 719 S.E.2d 329, 341 (2012) (quoting Helen W. v. Fairfax Cty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991)). Nevertheless, we also must "presume that the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's [or children's] best interests.'" Id. (alteration in original) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). Consequently, "[w]here, as here, the court hears the evidence *ore tenus*, its finding is entitled to the same weight accorded a jury verdict, and it will not be disturbed on appeal unless plainly wrong or without evidence to support it." Welch, 64 Va. App. at 44, 764 S.E.2d at 289 (quoting Martin, 3 Va. App. at 20, 348 S.E.2d at 16).

Mother assigns error to the circuit court for denying her motion to strike and terminating her residual parental rights to C.J. and C.A., contending that the evidence presented by DHS failed to establish that the criteria for termination under Code § 16.1-283(C) had been satisfied.[1] We address each of the requirements for termination in turn.

---

[1] Although mother assigns error to the circuit court for finding sufficient evidence to terminate her residual parental rights under the criteria "set forth in . . . Code § 16.1-283(C)," we note that the circuit court terminated her rights under the specific provisions of subsection (C)(2). Thus, we confine our analysis to the circuit court's "best interests of the child" determination and its further findings under Code § 16.1-283(C)(2), and do not consider the sufficiency of the evidence to terminate residual parental rights under Code § 16.1-283(C)(1).

A.  Best Interests of the Children

Mother argues that the circuit court's finding that it was in the best interests of C.J. and C.A. for her residual parental rights to be terminated is not supported by clear and convincing evidence.  We find no merit to this argument.

This Court has previously noted that "'there is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard."  Welch, 64 Va. App. at 48, 764 S.E.2d at 291 (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).  Rather, a child's best interests must be determined "in light of the facts of each case."  Eaton v. Wash. Cty. Dep't of Soc. Servs., 66 Va. App. 317, 331, 785 S.E.2d 231, 239 (2016) (quoting Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407 (1982)).  In making such a determination, a court "must evaluate and consider many factors," including "the age and physical and mental condition of the child," the child's needs, the role the "parent has played . . . in the upbringing and care of the child," and any other necessary factors.  Id. (quoting Harrison v. Tazewell Cty. Dep't of Soc. Servs., 42 Va. App. 149, 161, 590 S.E.2d 575, 581-82 (2004)).  "The best interests of the child are to be determined at the time of the termination hearing."  Akers v. Fauquier Cty. Dep't of Soc. Servs., 44 Va. App. 247, 259, 604 S.E.2d 737, 742 (2004).

In the instant case, the circuit court's best interests determination relied heavily upon two factors:  the need to protect C.J. and C.A. from further abuse and injury, and the passage of more than a year since the children were placed in foster care.  Mother acknowledged that her children were removed from her care because they had sustained serious physical injuries.  She also claimed that she and father were the children's caretakers and that no one else had been in a position to harm C.J. and C.A.  She denied that she had caused the children's injuries, and stated that she felt another family member was responsible, but would not identify that person.  Neither mother nor father ever provided DHS with information about the person or persons possibly

responsible for the injuries which DHS could investigate. Mother had sought a protective order against father for domestic violence, and was living with him at the time of the circuit court proceedings. Under these facts and circumstances, it was impossible for DHS to eliminate mother or father as possible sources of the abuse, and thus impossible for DHS to consider potentially exposing C.J. and C.A. to further physical harm by returning them to mother's unsupervised care.

Further, while additional information indicating who was responsible for the abuse might eventually have come to light, thus enabling the circuit court to establish guidelines to prevent further abuse, seventeen months had passed since C.J. and C.A. were placed in foster care. Code § 16.1-283(C)(2) establishes a twelve-month time limit for substantial remediation of the conditions which led to a child's placement in foster care, and this time limit "was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness . . . in addressing the circumstances that resulted in the foster care placement." Thach v. Arlington Cty. Dep't of Hum. Servs., 63 Va. App. 157, 171, 754 S.E.2d 922, 928-29 (2014) (quoting L.G. v. Amherst Cty Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003)). If those circumstances are not addressed within the statutory time frame, "the court may act to prevent the child from lingering in foster care," L.G., 41 Va. App. at 57, 581 S.E.2d at 889, since "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities," Tackett v. Arlington Cty. Dep't of Hum. Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). In light of these facts and circumstances, the circuit court reasonably determined it was not in the best interests of C.J. and C.A. to remain indefinitely in foster care, in the hope that their abuser might someday be revealed or discovered to be someone other than a parent.

Further, the evidence supports that C.J. and C.A. were thriving in the care of a foster parent who hoped to adopt them. C.J. had been hospitalized for failure to thrive prior to her removal by DHS, but she and C.A. had seen their medical issues resolved and remediated by therapy in their foster home. The twins were experiencing night terrors less frequently, and had developed supportive relationships with their foster parent's other children and family members. C.J. and C.A. had spent all but the first four months of their twenty-one months of life with their foster parent, who, with her husband, now wished to give them a permanent home.

Based upon these facts and circumstances, we are satisfied that clear and convincing evidence supports the circuit court's best interests determination. We therefore cannot say that its best interests finding was plainly wrong.

### B. Failure to Substantially Remedy Conditions within Twelve Months

Mother also argues that the circuit court's finding that she was unwilling or unable, without good cause and within a reasonable period of time, to substantially remedy the conditions which led to her children's foster care placement is not supported by clear and convincing evidence. She contends the evidence in fact proves the opposite, for two reasons.

First, mother argues she substantially remedied the conditions at issue when she complied with DHS recommendations by completing parenting classes, participating in structured family therapy and regular visitations, submitting to a psychological and parenting capacity evaluation, and finding steady employment and stable housing after she moved to Baltimore. Mother maintains that only by declining to undergo a polygraph test did she fail to comply with DHS recommendations and that this was no basis for terminating her residual parental rights because polygraph testing was suggested, not required, such tests are scientifically unreliable and untrustworthy, their results are inadmissible during revocation or other court proceedings, and evidence of a person's unwillingness to submit to such a test is also inadmissible.

We find no merit to mother's argument that the evidence proves she substantially remedied conditions by complying with DHS recommendations. While DHS acknowledged, in its December 2016 foster care service plan submissions to the J&DR court, that mother had made "some progress" toward achieving the return home of C.J. and C.A., it also noted that she had been "challenged in engaging with her services." Mother completed parenting classes, but her participation in structured family therapy gradually decreased and then ceased in 2017, except for occasional one-on-one telephone calls to "check in" with her therapist and "kind of get some focus." Mother also missed a number of scheduled, supervised visitations, or cancelled them at the last minute. When she did attend, she at times appeared disengaged and exhibited a flat affect. Mother did find stable employment and housing after moving to Baltimore, but only after an extended period of unemployment and housing instability. Prior to her relocation, she was unemployed after leaving the Navy and had lost her apartment when disputes with father caused the housing authorities to force them to leave. Mother did complete a psychological and parenting capacity evaluation with Dr. Gildea, but that June 2016 evaluation indicated challenges that would continue to prove problematic for mother over the following year. Dr. Gildea noted mother's "consistent pattern of failing to maintain stability and function with the addition of life stressors," and when mother ceased her service with the Navy, lost her housing, and again became pregnant in late 2016, an extended period of instability and reduced function followed. During this period, mother's communication with DHS became "very sporadic." Thus, the evidence contradicts mother's argument and supports DHS's conclusion that even without C.J. and C.A. back in her care, mother demonstrated an inability to navigate life stressors and a lack of sufficient progress with her service plan goals. Lastly, while Dr. Gildea did suggest that mother and father submit to polygraph tests to help clarify the events that preceded their children's injuries, and while both mother and father initially refused those tests, each later

testified in circuit court that they would agree to take such a test. Thus, contrary to mother's implication, the circuit court could not have relied upon mother's initial refusal to take a polygraph test as a basis for terminating her residual parental rights.

Second, mother argues she substantially remedied the conditions at issue by acknowledging the seriousness of her children's injuries and determining to be vigilant, so that C.J. and C.A. are protected and do not suffer intentional injuries again. Mother contends that her inability to explain how C.J. and C.A. suffered their injuries did not justify terminating her parental rights under Code § 16.1-283(C), because the statute does not require her to confess having caused her children's injuries, or to explain how or by whom the injuries were inflicted.

We find this argument without merit. Mere acknowledgement of the seriousness of the abuse found by the J&DR court, and of the necessity of protecting C.J. and C.A. from abuse, does not remedy the condition which led to the children's foster care placement—*i.e.*, their exposure to non-accidental injury at the hands of an unknown party or parties, where neither mother nor father could be excluded from culpability. Determining to be vigilant and protect one's children also falls short of remedying that condition. These alleged proofs of substantial remediation are no more than acknowledgements and expressions of the duties owed by every parent to their children. See Barrett v. Commonwealth, 268 Va. 170, 184-86, 597 S.E.2d 104, 111-12 (2004) (discussing, in the context of convictions for criminal neglect in violation of Code § 18.2-371.1(A) and (B), a parent's duty of injury prevention and protection). Further, with respect to mother's contention that Code § 16.1-283(C) did not require her to explain how or by whom her children were abused, we note this Court's previous observation that termination decisions under Code § 16.1-283(C)(2) "hinge . . . on the demonstrated failure of the parent to make reasonable changes," thus "requir[ing] the court to determine whether the parent has been unwilling or unable to remedy the problems." Thach, 63 Va. App. at 170, 754 S.E.2d at 928

- 14 -

(second alteration in original) (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005)).  Here, fourteen months before the circuit court terminated mother's residual parental rights, mother told Dr. Gildea that she felt a family member was responsible for the children's injuries.  However, mother kept the individual's identity secret.  Mother's ongoing refusal to identify the suspected abuser of her children, long after she revealed her suspicion and longer still after C.J. and C.A. were placed in foster care, was a demonstrated failure of mother to make a reasonable change in her behavior—a change which would have helped remedy the conditions which led to foster care placement by assisting, or even resolving, DHS's efforts to establish culpability for the abuse.

We are satisfied that clear and convincing evidence supports the circuit court's finding that mother was unwilling or unable, without good cause and within a reasonable period of time, to substantially remedy the conditions which led to foster care placement for C.J. and C.A.  The children were taken into care because they had been physically abused by an unknown person or persons, and neither parent could be excluded from responsibility for that abuse.  Mother and father each maintained they were innocent of the abuse, and each insisted the other was innocent.  Both indicated they were the children's main caretakers, and mother insisted she was the primary caretaker, responsible for all the care of C.J. and C.A.  Mother testified that only she and father were in a position to harm the children, and father never admitted to third parties being with the children during the time when the injuries occurred.  Thus, neither mother nor father could provide an explanation for their children's non-accidental injuries, since by their accounts, they were not responsible for the injuries and no one else could have been responsible.  While mother did express suspicion that a family member was at fault, she would not divulge the family member's name.  In light of these circumstances, neither mother nor father could be excluded as a potential abuser, and DHS was unable to address why the children came into foster care or to

- 15 -

return them to their parents. Nor could DHS progress with the children's service plans, because they could not allow unsupervised visits or provide in-home parenting coaching. Further, mother had sought a protective order against father, alleging domestic violence, yet continued to live with him at the time of the termination hearing. A reasonable fact finder could have concluded from this evidence that mother was, without good cause, unwilling or unable to take the steps necessary to substantially remedy the conditions at issue, by being forthcoming with DHS and assisting their efforts to ensure the children could safely return home. That fact finder could also have concluded that the seventeen months between the children's foster care placement and the circuit court's termination of mother's residual parental rights was a more than reasonable time for mother to substantially remedy conditions, and well in excess of the twelve-month statutory period prescribed by Code § 16.1-283(C)(2). Thus, we cannot say the circuit court was plainly wrong in reaching the same conclusions.

## C. Reasonable and Appropriate Agency Efforts

Mother also argues that the circuit court's finding that DHS made reasonable and appropriate efforts to help her substantially remedy the conditions at issue is not supported by clear and convincing evidence. Specifically, she contends that DHS "made little effort to offer services to [her]."[2]

---

[2] Mother further contends that DHS failed to offer her services after she moved to Baltimore, or to refer her to services there. However, mother failed to preserve this argument by presenting it to the circuit court, either in her motion to strike or in closing argument. "The primary purpose of requiring an argument to be made to a trial court is 'to alert the trial judge to possible error so that the judge may consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals and mistrials.'" White v. Commonwealth, 67 Va. App. 599, 604, 798 S.E.2d 818, 820 (2017) (quoting Neal v. Commonwealth, 15 Va. App. 416, 422, 425 S.E.2d 521, 525 (1992)). Our Rule 5A:18 embodies this purpose, by providing, in pertinent part, that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Mother does not argue for the application of the good cause or ends of justice exceptions to the rule, "and we will not invoke them *sua sponte*." Williams v. Commonwealth,

We find no merit in this argument, and are satisfied that clear and convincing evidence supports the circuit court's finding that DHS made "reasonable and appropriate efforts" to help mother remedy the conditions that led to her children's foster care placement. The "reasonable and appropriate efforts" requirement under Code § 16.1-283(C)(2) must be interpreted "in accordance with the language chosen by the legislature. 'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case." Harrison, 42 Va. App. at 163, 590 S.E.2d at 582-83 (quoting Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 4 (1992)). "Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before [it]." Id. at 163, 590 S.E.2d at 583. Here, DHS identified mother's need for an improved understanding of developmentally appropriate and non-corporal disciplinary techniques for her children. It also identified mother's challenges maintaining stability and function in her life when confronted with stressors, and the high risk that she would be unable to protect her children. To address these needs, challenges, and risks, DHS offered mother a suite of services to improve her parenting skills, marital and family dynamics, resiliency, and relationships with her children. While DHS did not provide parenting coaching, it refrained from doing so only because mother and father had not progressed sufficiently for C.J. and C.A. to stay unsupervised in their parents' home, where the coaching was to occur. DHS continued to offer these services throughout a nine-month period, while they pursued an ultimate goal of returning the children to their home, and only began to withdraw services after it became clear that a goal of adoption was in the best interests of C.J. and C.A. Further, DHS repeatedly engaged with mother in an effort to determine who was

57 Va. App. 341, 347, 702 S.E.2d 260, 263 (2010). Thus, because mother failed to present to the circuit court her argument that DHS offered her no services or assistance after she moved to Baltimore, we consider only her argument that DHS "made little effort" to offer her services before her move.

responsible for the abuse of C.J. and C.A. DHS offered these wide-ranging services even as mother began to avail herself of them less frequently. In light of this evidence, we cannot say the circuit court was plainly wrong in finding that the efforts of DHS to assist mother were reasonable and appropriate.

## III. CONCLUSION

Clear and convincing evidence supports the circuit court's factual findings that the termination of mother's residual parental rights was in the best interests of C.J. and C.A., that mother was unwilling or unable, without good cause and within a reasonable period of time not to exceed twelve months, to substantially remedy the conditions which led to her children's foster care placement, and that DHS made reasonable and appropriate efforts to help mother attempt to substantially remedy those conditions. Thus, the circuit court did not err in denying mother's motion to strike and terminating her residual parental rights, because the termination criteria under Code § 16.1-283(C) were satisfied. Consequently, we affirm the circuit court's termination of mother's residual parental rights.

Affirmed.